Jessie MacKenzie, Respondent, v. Albro R. Carman, Appellant, Impleaded with Willis S. Cooke, Defendant.

*Duty of a physician or surgeon in the treatment of a patient — for what he is liable.*

A physician and surgeon when treating a patient assumes two obligations, the *first*, that he possesses the reasonable degree of learning and skill which is ordinarily possessed by physicians and surgeons in the locality in which he practices and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing

medicine and surgery; the *second,* that he will use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed, and that he will use his best judgment in exercising such skill and applying his knowledge.

He is liable for an injury to his patient resulting from want of the requisite knowledge and skill or from his omission to exercise reasonable care or his failure to use his best judgment.

He is not liable for a mere error of judgment provided he does what he thinks is best after a careful examination. He does not guarantee a good result.

APPEAL by the defendant, Albro R. Carman, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 2d day of February, 1904, upon the verdict of a jury for $2,500, and also from an order entered in said clerk's office on the 4th day of February, 1904, denying the said defendant's motion for a new trial made upon the minutes.

*Edwin A. Jones,* for the appellant.

*Frederick Hulse,* for the respondent.

INGRAHAM, J. :

The defendants are physicians, and treated the plaintiff for a fracture of the bone of the arm about an inch above the wrist. Splints were applied to the arm to hold the broken bone in place, and when these splints were removed two black spots appeared on the surface of the wrist, which subsequently developed into ulcers and resulted in a permanent injury to the plaintiff's arm, for which she sought by this action to hold the defendants jointly liable. The case was submitted to the jury, who found a verdict against both defendants, and from the judgment entered upon that verdict the defendant Carman appeals.

It appeared that on January 14, 1901, the plaintiff, twenty-three years of age, fell on the sidewalk and fractured her arm; that she went to the office of the defendant Carman, who was not in, but was referred by somebody in the office to the defendant Cooke, who set the fracture and applied splints; that the next morning both defendants saw the plaintiff at her residence, took off the splints, examined the arm and put on other splints, placing under the splints small pads of cotton to keep the broken bones in place; that the

FIRST DEPARTMENT, APRIL, 1905.　　　[Vol. 103.

defendant Carman saw the plaintiff again on the sixteenth, seventeenth and nineteenth of January; that on the nineteenth he removed the splints, and found, as he testified, a tendency at the ends of the bones to tilt up, that he replaced the splints, with the pads of cotton, as he thought tight enough to hold the bones in place so that there would be a good union; that on January twenty-second and the twenty-fifth the defendant Carman again saw the plaintiff, removed the bandages, but did not remove the splints. There is no evidence that at that time there was any mark on the wrist; but plaintiff complained of pain and the hand was swollen and discolored; that the plaintiff called at his office on February 7, 1902, when, as he testifies, he had been taken ill; that then he made no further examination, but referred the plaintiff to the defendant Cooke, telling plaintiff he was going away; that he was confined to his bed with illness from February seventh to the twenty-eighth, when he left town and did not return until March eleventh. The plaintiff testified that she complained to the physicians of pain in her arm and that the bandages were too tight, and was informed that they had to be tight to keep the bone in place; that she did not see the defendant Carman after February seventh and he was not again called upon to treat the plaintiff; that she saw Dr. Cooke on February fifteenth and he told her it was about time to have the splints taken off and that she should come to see him a week later; that she did not call upon him again until February twenty-eighth after she had removed the splints on the twenty-seventh, at which time these spots had appeared on her arm. Dr. Cooke subsequently treated her arm for a week and then referred her to a Dr. McLean; that she called upon Dr. McLean, who was not in, and subsequently called upon a Dr. Cramer, who treated her for a year and a half, and the result is that the wrist joint is stiff, the movement of the thumb and fingers much impaired with a loss of sensation, and that this condition will be permanent.

The appellant claims that as to him the complaint should have been dismissed, as the evidence is not sufficient to sustain a finding that he failed to treat the plaintiff with the skill which the law imposes upon a physician who undertakes to attend a patient, and that there is no evidence that he was negligent in the treatment of the plaintiff. The liability of a physician and surgeon to a patient

is based upon two obligations which he assumes in undertaking the care of a patient. The first is that he possesses "that reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery;" and the second is that he undertakes to use reasonable care and diligence in the exercise of his skill and the application of his learning to accomplish the purpose for which he was employed; and he is "to use his best judgment in exercising his skill and applying his knowledge," and he is liable for an injury "to his patient resulting from want of the requisite knowledge and skill, or the omission to exercise reasonable care, or the failure to use his best judgment." The law thus requires a surgeon to possess the skill and learning which is possessed by the average member of the medical profession in good standing, and to apply that skill and learning with ordinary and reasonable care. He is not liable for a mere error of judgment provided he does what he thinks is best after a careful examination. He does not guarantee a good result, but he promises by implication to use the skill and learning of the average physician, to exercise reasonable care and to exert his best judgment in the effort to bring about a good result. (*Pike* v. *Honsinger*, 155 N. Y. 201.) From the day after the accident on January 15, 1901, until February 7, 1901, when he became sick, the appellant was undoubtedly the physician in charge of the plaintiff's case and responsible for the treatment. The plaintiff testifies that on the seventh of February when she called on Dr. Carman there was some talk about the doctor being ill or going away; that he then said he was going away and that if the plaintiff wished to see any one, to go to Dr. Cooke after that. The evidence is undisputed that from that time on he was ill and absent and did not again see the plaintiff; and so far as appears, he had no further charge of the case.

There is no evidence to show, as I read this record, that up to the time the appellant was taken sick, he was guilty of any want of reasonable care of or attention to the plaintiff's case. There is nothing to show that his visits were not as frequent as the situation required. His first call was on the morning of January fifteenth, the day after

the accident.   Upon cross-examination the plaintiff testified that the appellant called twice on the fifteenth, the day after the accident; twice on the sixteenth; twice on the seventeenth; that he called with Dr. Cooke on the eighteenth; that he called on the nineteenth, and on the twentieth, and that that was the last time that he called at the plaintiff's house; that the plaintiff called on the appellant at his office on the twenty-fourth and thirty-first of January and on February seventh; that at that time she was told to call on Dr. Cooke for further treatment, and that she next called on Dr. Cooke on the eleventh, a week later.   The plaintiff's counsel, in stating the plaintiff's claim, said : " We do not claim anything from the fracture, so far as the union is concerned, there is no question there.   Our contention is that the pressure of the splints was so strong that it caused this mortification of the flesh ; that is the contention."   So that the right of the plaintiff to recover from this appellant must depend upon proof that the appellant failed to use the reasonable degree of learning and skill that is ordinarily possessed by physicians and surgeons in the locality where he practices, and which is ordinarily regarded by those conversant with the employment as necessary to qualify him to engage in the business of practicing medicine and surgery and to use his best judgment in exercising his skill and applying his knowledge.   When the appellant was called in to attend the plaintiff he found that she had sustained a Colles fracture of the bone of the forearm just above the wrist.   He secured the broken bones in place by the application of splints, and to keep the bones in place he placed wads of cotton under the splints opposite the break in the bone.   He removed these splints at least twice, and he testifies that both times he found indications that the bone would, as he called it, tilt, so that the ends of the bones would not be in proper place, and that he replaced the splints with these wads of cotton to hold the bones in place.   The expert who subsequently treated the plaintiff testified that " the question of putting on bandages, that is a question of best judgment.   And how tight they should be put on would depend on the nervous muscular strength of the patient, and that is purely a matter within the judgment of the physician who is attending.   There is no doubt about that. Splints, when they are put on, always make pressure.   Where there

is a fracture of the wrist to put on with pads to hold the bones together under the splints is often done, but I don't consider it necessary, but it is done and it is good surgery by good surgeons. It is accepted by the authorities as good surgery to put those pads in. The purpose of those pads is to keep the two ends of the bones in opposition. * * * The splints would not be of any use if they were not put on tight enough to hold the bones in place. * * * The idea is to hold those bones in place no matter what the method, and if it holds them in place then it has fulfilled the function for which it was employed. The simplest splint is the best too. The uses of different methods are matters of opinion among the profession. There are a great many different ways for dressing fractures. The general principle is to keep the bones together. That is one of the objective points. * * * The amount of pressure to put on any given fracture is a very difficult thing to determine. If you do not put on enough pressure you will get a malformation of the bones, the bones will wiggle or get away and you will get a faulty union. If you put on too much pressure you will get a sloughing, gangrene, necrosis. Consequently, in order to, in any given case, it is impossible to know whether you put on too much or too little. The tendency always is to put on too much, because that is easily modified. * * * I spoke of the amount of pressure that was necessary that it was very difficult to determine. That is a matter of the physician's best judgment. * * * I said it was the rule to put on too much pressure and then lighten it up. That is what I do right along. They did not put enough pressure on her to have a faulty union, they have got a good union. It is a splendid union; it is all right."

I think that the evidence is undisputed that up to the time that appellant was taken sick and turned the case over to Dr. Cooke his treatment was just what is here described by the plaintiff's expert as "good surgery by good surgeons." He adjusted the splints with the amount of pressure that he considered necessary to hold the broken bone in place. The result was "a splendid union." There is nothing to show that, if there had been less pressure, there would not have been a faulty union or that there was more pressure applied than was necessary to hold the broken bone in place. That was a matter which depended upon the judgment of the physician.

That the splints were not removed after February seventh was not the fault of the appellant, and there is nothing to show that these black spots, which afterwards developed into ulcers, had appeared when the appellant ceased to attend the plaintiff. For what happened afterward he was not responsible.

I think, therefore, that the evidence was insufficient to justify a verdict against the appellant, and that the judgment against him and the order appealed from must be reversed and a new trial ordered, with costs to the appellant to abide the event.

VAN BRUNT, P. J., PATTERSON, McLAUGHLIN and LAUGHLIN, JJ., concurred.

Judgment and order reversed, new trial ordered, costs to appellant to abide event.