## HAMILTON v. HARRIS. (No. 6395.)

(Court of Civil Appeals of Texas. San Antonio. June 9, 1920. Rehearing Denied July 1, 1920.)

1. **Physicians and surgeons** &#9096;14(4) — **Need exercise only ordinary skill when using X-ray.**

A physician is not liable for injuries resulting from use of X-ray where he exercises such reasonable care and skill as is ordinarily exercised by reputable physicians in the locality.

2. **Physicians and surgeons** &#9096;14(1) — **Compelled to look only for natural and probable results from treatment.**

A physician is not expected to look for unexpected results from treatment of his patients, and is not expected to anticipate results arising from peculiar characteristics and conditions of a patient; and, while the treatment and character of the injury may be looked to as a circumstance, in the absence of testimony explaining, it may or may not be conclusive.

3. **Physicians and surgeons** &#9096;18(9)—**Negligence in using lead blanket containing hole larger than diseased spot with X-ray held properly submitted.**

In an action for damages for burning in X-ray treatment, *held* that court did not err in submitting issue as to whether defendant was negligent in using lead blanket having opening 6½ inches in diameter, where diseased spot was only size of a dollar, where blanket was introduced by defendant in evidence for what it was worth.

4. **Physicians and surgeons** &#9096;18(6) — **Burden on physicians to show patient burned by X-ray had hypersensitive skin.**

In an action for damages for X-ray burn, where defense was that plaintiff had a hypersensitive skin, it devolved upon defendant physician to prove that plaintiff had such a skin.

5. **Physicians and surgeons** &#9096;18(9)—**Whether plaintiff burned by X-ray had hypersensitive skin for jury.**

In an action for damages for alleged negligent X-ray burn, whether plaintiff had a hypersensitive skin, as alleged by defendant, *held* for the jury.

6. **Physicians and surgeons** &#9096;18(9)—**Whether burning by X-ray was negligent, held for jury.**

In an action for damages for X-ray burn, whether the burn was the result of negligence on the part of defendant physician *held* for the jury.

7. **Damages** &#9096;38—**Impaired capacity to earn money is element of damages for injuries.**

In negligence cases an injured person is entitled to recover damages for impaired capacity to earn money, the natural and proximate consequence of such negligence.

---

&#9096;For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes .

**8. Damages** ⊂⟳166(2)—**Recovery for permanent injuries dependent upon circumstances.**

In suits to recover damages for alleged permanent personal injuries, the recovery must be made to depend upon the facts and circumstances of each case.

**9. Damages** ⊂⟳166(2) — **Jury may consider whether injuries are permanent or temporary.**

In assessing damages for personal injuries, the jury may take into consideration whether the injury complained of is permanent or merely temporary in its nature.

**10. Damages** ⊂⟳185(2) — **Future or permanent disability must be reasonably certain.**

In order to justify the assessment of damages for future or permanent disability, it must appear that a continued or permanent disability is reasonably certain to result from the injury complained of.

**11. Physicians and surgeons** ⊂⟳18(9)—**Future or permanent disability held properly submitted to jury.**

Where merchant, negligently burned between the legs by X-ray, testified to his capacity to get about, walk, and attend to his business affairs and to travel in connection with his business, and to extent the returns from his business were diminished, and it appeared the condition was permanent, the court properly submitted the question of future and permanent disability to the jury.

**12. Physicians and surgeons** ⊂⟳18(11)—**$3,500 not excessive for X-ray burn.**

A verdict of $3,500 was not excessive for an X-ray burn between the legs of a merchant, resulting in an operation, great suffering, permanent inconvenience by reason of grafting of pig skin, and lessening of power to attend to his business.

Appeal from District Court, Bexar County; Randolph Carter, Special Judge.

Suit by J. A. Harris against Dr. W. S. Hamilton. Judgment for plaintiff, and defendant appeals. Affirmed.

Hertzberg, Kercheville & Thomson, of San Antonio, for appellant.

T. H. Ridgeway and T. M. West, both of San Antonio, for appellee.

COBBS, J. This case was before this court on a former appeal, and is reported in 204 S. W. p. 450.

The suit was to recover damages alleged to have been committed by appellant upon appellee by the use of the X-ray, on account of the burns sustained, caused by the negligent application of the X-ray machine or current by Dr. Hamilton, in treating the plaintiff for a small spot of eczema, about the size of a silver dollar.

It was alleged that appellant gave appellee three different treatments, at intervals of five days intervening after each treatment.

After the third treatment, plaintiff's body became extremely sore and painful, and plaintiff then discovered the skin and flesh on the inside of, or between each of his thighs and legs, were severely and deeply burned, which compelled him to go to a hospital and remain there for a period of two weeks, suffering intense pain, and finally to employ a surgeon to remove the burned tissues or flesh and to substitute new flesh over said burn, and he was compelled to remain in one position for a period of one month, until the grafted skin healed so as to permit him to leave the hospital.

The negligence alleged was: That the appellant failed to use proper protection and covering over his body in administering the treatment, which permitted the rays to touch the other parts of the skin, not diseased, on adjacent portions of the body. That the body should have been protected by a blanket of rubber and lead composition, with only a small hole therein the size of the diseased spot, through which only the rays could pass to the diseased part. That appellant used a blanket or protection, with a circular hole measuring about 6½ inches in diameter, too large for the purpose. That the current used was too strong. That appellant was negligent in permitting it to remain too long on the body. That the tube of machine was placed too close to the body. If appellee possessed a hypersensitive skin, appellant should have known it, and warned him of the danger involved in the X-ray treatment. That appellee was a strong man, with an earning capacity of $300 per month, and was only 33 years old. On account of injuries was permanently injured, and was compelled to remain in bed for a period of four months, and suffered constant pain, and was damaged in the sum of $19,000. The expenses for physician, nurse, and hospital fees amounted to $1,000.

Appellant answered by demurrer and general denial, and that appellee placed himself voluntarily in the hands of appellant for treatment with the X-ray, and he employed the usual and approved methods of treatment to protect the body of plaintiff by placing a composition of rubber and lead blanket of proper size and opening on the body of the plaintiff so as to protect that portion of the plaintiff's body to which the X-ray was not to be applied. Defendant further alleged that he was fully competent and experienced in the handling of the X-ray, and that he used every care and precaution known to his profession in this particular case, and was guilty of no negligence in treating plaintiff, and that if plaintiff was burned, it was not caused by defendant's negligence or carelessness, but was occasioned by the fact that plaintiff possessed what is known as a hyper-

⊂⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

sensitive skin, or one which is more susceptible to be burned by the application of the X-ray treatment than the skin of an ordinary person; and defendant further alleged that there was no manner or method known by which said hypersensitiveness could have been discovered before the application of the X-ray treatment, and that there was no manner or method known that he could have determined whether or not the plaintiff possessed a hypersensitive skin.

The cause was tried on November 12, 1919, before a jury, submitted on 19 special issues, and the jury returned a verdict for the plaintiff for the sum of $3,500.

It is not necessary for us to consider but few of these issues as important or material in the disposition of the case.

Appellant assigns special issue No. 4 as the first error, to wit:

"Did the defendant use a blanket or protection upon the plaintiff's body, containing a circular hole about 6½ inches in diameter?"

—the contention being that there was no evidence that the use of a blanket with that size of opening was not customary, or not used by physicians skilled in such treatment, or too large for the purposes of treatment of appellee's disease, and, if not, the court should not have submitted the issue. In reply to first issue the jury found that defendant protected plaintiff's body with a blanket or composition of rubber and lead, and the effect of the answers to 2 is to the same effect, and thereby answered, in effect, there was no negligence in not protecting the body, as there was such a covering used. In reply to issue No. 4 they found that the body was protected by a blanket, with a circular hole therein about 6½ inches in diameter, and in reply to the special issue No. 5, "Did the use of the blanket with a circular hole therein of about 6½ inches in diameter for protection constitute negligence?" they said "Yes," and then follows questions and affirmative answers, to wit:

(6) "If you answer 'Yes' to question No. 5, did such negligence directly cause any of the injuries, if any, alleged in plaintiff's petition?" "Yes." (7) "Did the defendant apply to the plaintiff's body a ray or dose of X-ray of such intensity and force as to be unsafe and improper?" "Yes." (8) "If you answer 'Yes' to question 7, did such appliance constitute negligence?" "Yes." (9) "If you answer 'Yes' to question No. 8, did such negligence directly cause any of the injuries, if any, alleged in the plaintiff's petition?" "Yes."

These questions are all complained of in nine assignments, and are so similar they will be considered together without further setting out the assignments or propositions thereunder.

The jury found that appellant protected appellee's body with a blanket or composition of rubber and lead, and that there was for that reason no negligence. Upon that issue there was a dispute between appellant and appellee, but the jury believed appellant on this issue. The jury found in answer to the fourth question that the blanket was provided with "a circular hole therein about 6½ inches in diameter, which constituted negligence." Without following the numerous interrogatories or issues propounded to the jury by the court to answer, it is proper to say they tend to find, though appellee's body was protected, the hole in the blanket was too large, contrary to the testimony, for the spot of eczema intended to be X-rayed, and allowed the ray to be administered too strong, and permitted the well flesh to become involved, which caused the injury and suffering to appellee. But this is not sufficient of itself to show negligence, for the testimony of the doctors is to the effect that the hole should be much larger than the immediate place to be X-rayed, and should directly treat 2 or 3 inches on each side; in eczema, irradiate all skin all the way, because is spreads, to prevent its coming on other skin and spreading it.

The only testimony offered as to the character of protection used was that given by appellant and that by appellee. Appellee testified there was no protection placed over his body the first and second treatment, but at the third treatment he used a shield; that he never felt any burn after either the first or second treatment, but did after the third treatment; that was after he says the protection was used. The testimony of appellee shows the burn to have been very severe, and said:

"The machine was over against the wall like this (illustrating), and he has a table—one of these regular doctor's tables, made in about three sections, so you can raise it and lower it at the head, and also at the foot, and then it has a couple of iron stirrups in like this (indicating), and I lay down on my back on that table. I had to remove my pants and underclothing; I had to bare my body to the rays. Then he put his tube out, close to my body, and turned on his machine and left the room, and I was in that position, a kind of half sitting position, on my back, with my feet up in the stirrups, and this tube was placed down below here (indicating)—I don't know just how close to my body, 8 or 10 inches or—I don't know just exactly how close, but very near; and he came in in a few minutes and turned off the machine and told me to return again in five days. * * * At that time there was not any covering or protection whatever placed over me by Dr. Hamilton. I returned in five days and took the same treatment. There was not any protection at all placed over my body the second time. Dr. Hamilton asked me to return again in another five days, which I did. I took the third treatment, just like the first two, except on the third treatment he covered my hand—the back of my hand, with a lead sheet

of some sort; he did not do that on the first treatment—I said a lead sheet—such a sheet that looks like a piece of rubber, and I believe they say it is impregnated with lead. * * * The area of that burn was as large as my two hands—that is, on the side of the hip; and of these fingers (indicating right hand) the nails came off, the fingers were exposed from there out (indicating). You see this circle of rays, like this (illustrating), came around the ends of the fingers, and all that skin came off, sloughed. * * * Yes; I want to state the spot that was to be treated was on this side of the hip (indicating right side). As I stated before, the place that was cut out, where the skin grafting was, did not touch that place at all, but that eczema spot is still there, the red skin where I was burned includes the place, but that is only in the outer edges of the area where I was burned, where I was burned the worst, but where the grafting was necessary was in the center, and from this spot of eczema to the center of that place where the grafting was, was 3 to 4 inches; the burn wasn't right over the eczema spot at all.

"The burn was right in the center, and the eczema spot is over on the right side. * * * I saw the tube before he placed it near me, the tube is a large thing, like an electric lamp globe, but it has a round bulb, and then it has tubes; two or three different tubes run out from it. I couldn't tell you how near to my body that tube was placed—somewhere within 6 or 8 inches, 10 inches—I couldn't tell you just how close. I do not know. * * * After the third treatment I complained—he had used the shield on the third treatment, and after the third treatment I complained of a burn. The third treatment was the last treatment I had. I have no idea what current was used on me the first time, I do not know whether it was a strong current or a weak current. I don't know what current was used the second time, nor the third time. I never did keep the time that the tube was held against my body the second time, nor did I keep a record of it the third time. As to how far the tube was placed from my body the second time—I think each measurement was about the same; I did not measure it, and do not know how near."

Among other things, appellant testified:

He placed him on the table in a reclining position, not flat on his back, but simply in a semireclining position, with his legs elevated in stirrups. It exposed the whole lower portion of his buttocks and scrotum and that portion entirely. That it was impossible for any man to see down and see his buttocks, and in that position it was absolutely impossible for him to see the buttocks himself. He might be able to look over and see the tube in general perspective, in a general way, but it would be impossible for him to judge the distance of the tube from his body. "Having gotten him in that semireclining position, I set the tube in position, about ten inches from his body, over the diseased parts, and then took a sheet of lead and rubber mixture, which is used for that purpose because the X-ray will not penetrate it, and covered his scrotum with that. As to whether it is the custom of myself and men who administer the X-ray treatment to put a shield over the parts to be treated, I will state it depends altogether upon the case; there are very few cases which I treat and use a covering at all, unless it is something of a cancerous nature, or a very small fine spot. In treating eczema I rarely use anything at all. I used a sheet in this case because there was danger to the testicles. If it had been on the back or stomach or side, I would have used no sheet at all. * * * The patch of eczema was about the center of the hole in the sheet, through which he was treated with the X-ray, and the size of the burned area was something like 3 inches in diameter—$3\frac{1}{2}$, possibly. I exposed the portion to the rays eight minutes, which was a proper treatment in a case of this character of eczema, located as it was. I had the tube 10 inches away from the body, which was a proper distance in a case of this character, considering the eczema, for the tube to be from the body. The current I applied was one milliamperemeter. The ampere is the standard of currents passing through any electrical wire. The milliamperemeter means a thousandth of one ampere, just a very minute amount of current under ordinary conditions. That was the proper amount of current to apply. It was five days before the patient came back again, under my instructions. When he came back the second time for the second treatment he did not make any statement to me as to feeling an inconvenience as the result of the first treatment. I prepared the patient the second time under identically the same conditions and preparations; placed him on the table as usual, covered him as usual; covered him with this lead sheet, as usual, and placed the tube 10 inches away from the body. I used a current of one milliamperemeter, and exposed him to the rays eight minutes. There was not any difference between the second treatment and the first; they were identical. I then told him to come back again at the end of another five days, and at the end of that time he did return. On this occasion, and before his third treatment, he made no complaint whatever of any burn. On that day I placed him on the table, covered his scrotum with a lead sheet, allowed it to go between his legs, placed the tube at 10 inches, gave him one milliamperemeter of current for eight minutes, using the same sheet each time. The interval of five days between each treatment was the proper time to be allowed to pass between times for treating that character of cases."

He also swore that appellee had hypersensitive skin.

The appellee does not substantially deny this testimony, except says that his body was protected only one time, and the jury found against him and in favor of appellant on this issue.

In this state of the testimony, the jury found that the dose of X-ray was of such intensity and force as to be unsafe and improper, and such application constituted negligence. They also found that the appellee did not have hypersensitive skin, but Dr. Hamilton swore he did have. Many physicians of eminence testified that if it was administered in the usual, ordinary, and most scientific

way there was little or no danger of serious injury to result, unless in a case of hypersensitive skin; and, according to the testimony of Dr. Hamilton, it was properly administered, and he had hypersensitive skin. He said that appellee had hypersensitive skin, and further stated, with the dose he administered, nothing but supersensitive skin would have caused that burn; that an ordinary dose will produce a serious burn only in about one man out of 7,000.

But appellee insists that "the only question left to be considered is, 'Was there any evidence of negligence?'" then proceeds to answer his own query, "The fact that Mr. Harris was burned constituted evidence that the X-ray was negligently applied," and upon this inference alone predicates a recovery.

The case, cited by appellee, of Jones v. Tri-State Telephone, etc., Co., 118 Minn. 217, 136 N. W. 741, 40 L. R. A. (N. S.) 485, 4 Neg. & Comp. Cases, 832, in support of such contention, has no application whatever.

The case of George v. Shannon, 92 Kan. 801, 142 Pac. 967, Ann. Cas. 1916B, 338, 6 Neg. & Comp. Cases, 1086, cited, holds that the court may submit to the jury they were authorized to consider the fact that plaintiff's body was severely burned, in determining whether or not appellant's use of the X-ray was negligent, careless, or unskillful.

And in Shockley v. Tucker, 127 Iowa, 456, 103 N. W. 360, cited, that "plaintiff was severely burned is some evidence in itself that the treatment was improper."

[1] But the rule in this state to determine the liability of physicians or surgeons for injuries sustained resulting from negligence or unskillfulness in the use of X-rays is the same applied in one class of cases as the others, whether such reasonable care and skill was used as is ordinarily exercised by reputable physicians in the locality. The court says, in Graham v. Gautier, 21 Tex. 120:

"The duty and responsibility of a physician is well stated by a judge in Pennsylvania: 'It is a rule of law that a medical practitioner never insures the result, but simply engages that he possesses a reasonable degree of skill, such as is ordinarily possessed by a profession generally, and to exercise that skill with reasonable care and diligence, and, again, to exercise his best judgment, but is not responsible for a mistake of judgment.' That is, after. he has, with reasonable care and diligence, exercised ordinary skill, he is not responsible for a mistake of judgment, or for the result if he should happen to be mistaken. Such are the rules applicable to the ordinary, implied undertaking of a physician. They may be varied by special circumstances or agreements."

This opinion is by the "Old Alcalde," whose opinions always carry great weight.

Combs v. King, 107 Me. 376, 78 Atl. 408, Ann. Cas. 1912C, 1121 reported in 3 Negligence and Compensation Cases Ann. p. 171:

"The physician is not an insurer. He does not warrant favorable results. If he possesses ordinary skill, uses ordinary care, and applies his best judgment, he is not liable even for mistakes in judgment. Medical science is not yet, and probably never can be, in many respects, an exact, certain science. The practitioner cannot be expected to know, or be bound to diagnose correctly, that which is unknowable, as many of our hidden ailments may be." Shockley v. Tucker, 127 Iowa, 456, 103 N. W. p. 360; Sweeney v. Erving, 228 U. S. 233–243, 33 Sup. Ct. 416, 57 L. Ed. 818, Ann. Cas. 1914D, 905.

[2] The physician is not expected to look for unexpected results from treatment of his patients, but is compelled to look for natural and probable results. He is not expected to anticipate results arising from 'peculiar characteristics and conditions of a patient, nor is he an insurer of unexpected results. So, while the treatment and character of the injury may be looked to as a circumstance, in the absence of testimony explaining, it may or may not be conclusive.

In this case, 204 S. W. 450, on former appeal, this court said:

"The evidence shows that appellant did not know of appellee's hypersensitiveness, and that there is no way to ascertain such a peculiarity prior to the treatment. Bogle v. Winslow, 5 Phila. (Pa.) 136; 1 L. R. A. 720, note. We think the jury should have been told in appropriate language that, if they believed the proximate cause of the injuries to appellee was his abnormal hypersensitiveness, but for which the injury would not have occurred, a verdict should be returned for defendant."

Here, that issue was specially submitted to them, in accordance with that holding, and the jury found against appellant on the issue he raised.

[3] We do not think it was error to submit the special issue in regard to the use of the blanket as a protection, containing a circular hole of 6½ inches diameter, for it was itself introduced in evidence by appellant for what it was worth, and identified by the testimony of appellant himself, and referred to by the medical witnesses as the proper kind of protection and proper size hole to have for the patch of eczema of the size proven. The place treated was the size of a silver dollar. The X-ray machine has a lever that by pushing it one way you get increased intensity of the ray, and by pushing it another way you can diminish it. He could be given an overdose or enough to burn him by leaving the lever pushed too far one way. By placing the tube too near the body the dose could be increased, or if left too long the burn could be produced. The instrument is a piece of mechanism subject to perfect control. The doctors say if the man did not have a hypersensitive skin and was burned, it would establish negligence; but, if properly adminis-

tered and he was burned, it would tend to show hypersensitive skin.

Dr. Adolf Herff said:

"If the tube is held at the proper distance, and the proper milliamperage is used, and the proper length of exposure is used, and it is applied the proper number of times, it usually does not burn the skin."

Again he said:

"If a man with a normal skin, not a hypersensitive skin, has the X-ray applied to him and he is burned, that would indicate to my mind that it might have been applied too strong, or the tube placed too near, or applied too long, any one of these things might cause a burn. The mere fact of the burn occurring indicates either that the operation was negligently done, or else he had a supersensitive skin."

[4-6] The defense was that appellee had a hypersensitive skin, and it devolved upon appellant to prove that appellee had such a skin. To accomplish that proof he brings in a number of doctors, who say either there was negligence or a hypersensitive skin. There is no proof of any hypersensitive skin, except Dr. Hamilton's testimony, but, on the other hand, two applications were made to the skin with no burn or other bad result. If hypersensitive on the third application, the skin should have been hypersensitive on the first and second applications, for with the great array of medical experts not one of them testified that the skin was more sensitive on the third application than on the first or second, and if that were the case the testimony shows that no greater precaution was taken by appellant on the third than on the first and second applications. It is evident that when Dr. Hamilton testified he had hypersensitive skin it was predicated upon the theory that the treatment was in all respects properly administered, and concluded therefrom it would not otherwise have burned. The jury did not agree with him, and found against his testimony, which they had the power to do. The fact that the skin did not burn, as stated, on the first or second application, and did on the third, is a very strong circumstance to support the finding of the jury that appellee did not have hypersensitive skin. All the testimony goes to show that the burn occurred in administering the third treatment, and there are very strong circumstances to show that it did. The third treatment must have been different from the former two in its severity, for in that treatment the hand was severely burned. No similar accident or burn happened in either of the two former treatments, and sufficient interval elapsed between the two former treatments to ascertain the fact. The testimony of appellee describing the character of the burn as being outside the small spot of eczema, the size of a silver dollar, might partially account for the burn, as the hole in the rubber covering was about 6 inches in diameter, through which the ray was administered to that small spot. The jury had the right to infer, had the rays been confined to the diseased spot, by a smaller hole in the covering, even permitting the rays to touch a small surface around and outside the same would not have burned the large surface, so they found the hole, when administered, was too large, and that caused it. Again, the jury may have concluded that Dr. Hamilton absented himself too long from the room and permitted the ray to burn too long. We overrule the assignment.

The fourteenth assignment complains that the amount of damages of $3,500 should be set aside as excessive, unreasonable, and unjust, and by the fifteenth assignment complaint is made that the court erred in submitting as an element of damage the impairment of capacity to labor in the future, because the evidence shows only temporary injuries, already cured and healed, and a full capacity to labor and earn money, the same as before the injury. The charge complained of is:

"And if you find from the evidence that such injuries are permanent and will impair plaintiff's capacity to labor in the future, you may include in your estimate such sum as you believe from the evidence would fairly compensate plaintiff for the impairment of his capacity to labor in the future."

We will consider these assignments together.

[7-12] Among other things, Harris testified:

"* * * It cracks and it splits; if I get too much strain on that, why, it will split, and if I get out and walk too much it will split, or, in cold weather, like one's hand will chafe and crack when exposed to the cold, why, this will always do the same way, and does now. It causes me more or less pain all the time; I have a heavy scar tissue there right between the legs where the skin ought to be pliable, but it is not. When I sit down on it for any length of time it gets sore, especially on a hard seat like this. I cannot sit for a very long time without it gets so sore I couldn't hardly walk, and when I get up straight this skin doesn't double right back like skin ought to, but seems to be in a stiff position, so I can't straighten up for a few minutes and be comfortable. With reference to the effect that condition has had upon my ability to walk and the movements of my body, well, it keeps me down some all the time; that is, I can walk, I can walk along as fast and as straight as any one else, but I cannot walk for a very long time without that becoming very sore and breaking out. When it becomes sore and breaks out, that causes me pain. It always hurts me in stooping. I can't stoop like any one else can. I can't spread my legs wide like any one else can; that is, I can, but when I spread that way I always feel like I am going to tear that skin. * * * As to how many months I was out of my business entirely, out of my store, there was only about five weeks I didn't go there at all, but there was months

that I could only just go down and check things up a little and leave—maybe there an hour during the day, but wasn't able to do anything when I was there. You might say I practically lost a year's time; and then after that, of course, it gradually got better, after the first year. I know what was the reasonable value of the services of a man in a store, such as I was, at that time, per month. I can only tell you by comparing it with the previous year. It wasn't worth less than $250 a month. If you will let me compare it with the last several years, or let me compare it with the year before, I can tell you better. * * * As to what effect this scar tissue had upon me, when riding on a train or being required to sit down for any length of time, as I stated a while ago, if I sit down for any length of time, whether it is on a hard place or any other, it causes this place to become extremely sore; and it hinders me in walking or working, either one, and I can't sit flat, like any one else, I have to sit on either side, and have to sit on my hands in that position (illustrating) to hold this scar up from the hard surface; and even in making a trip on the train—I am required to make a trip to St. Louis once or twice a year—and when I get there, why, it is extremely sore. It is always worse in the winter than in the summer—that is, it becomes hard, scaly, and cracked during the winter time. During cold spells it usually becomes cracked. Its color now and at the time when it cracks and bleeds is a red, a fiery red. * * * Since my operation by Dr. Smith and after I went back to the store, I have been carrying on my occupation as a merchant continuously since that time, and am now."

The appellee has suffered much on account of the burn, and will always suffer some inconvenience and irritation. Dr. B. F. Smith operated and had to take out a piece of flesh a quarter of an inch thick, and 3½ inches square, cut out all the granulated or burned tissues, and then grafted pig skin over the raw flesh. It took 1 hour and 20 minutes to perform the operation. Appellee had to then lie on his back, legs apart and elevated, with suspensory apparatus, for a week or ten days. Dr. Smith treated him for two or three months. The scar healed, but scar tissue over the skin is dense, fibrous, tough tissue—and will remain that way. Doctors' and hospital bills amounted to over $200. The scar tissue, Dr. Smith said, will probably cause inconvenience "and some little discomfort at times." He further testified:

"Mr. Harris, comparatively speaking, is a well man; he has suffered some inconvenience from this trouble. It has not ruined him; has not made him permanently unfit for his business."

Harris swore that the area of the burn was the size of two hands; that on the burnt hand the nails came off and the skin sloughed off, but no claim is made for injury to the hand. He suffered very much and could not sleep. A number of doctors refused to treat appellee, in San Antonio and other towns. He suffered terrible pains; was in bed for five or six weeks. It took four months for graft to heal. The sore and inconvenience and pain are permanent. The evidence showed him engaged in carrying on a mercantile business before his injury, which he carried on at the time of the trial just the same as he had before his injuries, but his injuries permanently impaired his ability to do the work involved in carrying on his business, for, as Dr. Smith said:

"It has not ruined him, has not made him permanently unfit for business, but he will probably have some inconvenience from this and some little discomfort from it at all times."

It is well said in Street on Personal Injuries, page 667:

"It is a universal rule that the plaintiff is entitled in cases of negligence to recover damages for impaired capacity to earn money the natural and proximate consequence of such negligence."

In suits to recover damages for alleged permanent personal injuries, the recovery must be made to depend upon the facts and circumstances of each case. 13 Cyc. 136, 137. "In assessing damages the jury may take into consideration whether the injury complained of is permanent or merely temporary in its nature, and award damages according to the circumstances of the particular case under consideration. In order to justify the assessment of damages for future or permanent disability, it must appear that a continued or permanent disability is reasonably certain to result from the injury complained of." 13 Cyc. 144, § 6; Tex. Trunk Ry. Co. v. Sam Ayres, 83 Tex. 268, 18 S. W. 684; 13 Cyc. 187a; Howard Oil Co. v. Davis, 76 Tex. 630, 13 S. W. 665. In Dallas Con. Elec. St. Ry. Co. v. Motwiller, 101 Tex. 521, 109 S. W. 921 it is held:

"There are several elements of damage to be considered in suits for personal injuries. As to some of them, it is practicable to prove the loss sustained with some degree of exactness. Such are doctor's bills, medicines, and the like. Of these the law requires such proof. In many cases the value of time lost by the plaintiff may also be so proved, while in some such proof cannot be made, as in case of a wife and mother performing the various duties of housekeeper. This is true also of earning capacity and of injury to it. The law only exacts the kind of proof of which the fact to be proved is susceptible, but it does exact that. The earning capacity of the plaintiff in this case, as a stenographer, was probably susceptible of definite proof. If it was otherwise, the facts which made it so should have been shown

to have entitled her to have the jury estimate it in their own judgment without fuller proof, and to allow full compensation as for a diminution in the amount of her earnings. Nevertheless, if there is evidence to show with sufficient definiteness the loss of any part of that which she would have earned but for her injuries, the submission of that element was justified. It appears that before she was hurt she could and did walk to and from her work, and that since her injuries she has been compelled to ride upon street cars. From their own general knowledge and experience the jury could say that this diminished to some extent the returns from her employment, and we think this evidence was as definite as should be required to show loss of earning power to the extent indicated by it. Evidence is adduced to put the jury in possession of facts from which they can determine the extent of impairment of earning power, and is not intended, in itself, to establish a fixed measure of damages. When the jury are informed of such a fact as that just stated, they have enough to enable them to allow something upon that score. That they are not so informed as to permit them to allow for the full extent of such loss is no reason for saying that they cannot allow for the part of which they are sufficiently informed. In answer to the first question it is proper only to say that the charge was not erroneous in submitting the element of damages referred to. As we have stated, all such charges are tested by the state of the pleadings and evidence in the case in which they are given, and the evidence must be such as the nature of that case calls for. It is not practicable therefore to lay down a general rule such as is called for by the first part of this question." Fordyce, Receivers, v. Withers, 1 Tex. Civ. App. 540, 20 S. W. 766; Railway v. Schuessler, 56 Tex. Civ. App. 418, 120 S. W. 1147.

It may be true, as said, he can attend to his business as a merchant, but he cannot do it so well as before. There was no proof offered to show how much his earning capacity was lessened after the injury. But it does show it to be a permanent impairment, and that his capacity to get about, walk, and attend to his business affairs and to travel in connection therewith has lessened his power, to an extent that diminishes the returns from his business, and definite enough too, as said in Railway v. Motwiller, herein cited, to be "required to show loss of earning power to the extent indicated by it, * * * and is not intended in itself to establish a fixed measure of damages."

The assignments are overruled.

There is no claim that there was any testimony showing improper conduct, or influence exercised upon the jury to secure this judgment. The injuries are such that under the circumstances we would not feel justified in reducing it.

There being no reversible errors assigned, the judgment is affirmed.