[Civil No. 2422.   Filed January 7, 1926.]

[242 Pac. 436.]

JOEL I. BUTLER, Appellant, v. LUCY V. RULE, Administratrix of the Estate of LUCILLE HOLLOWAY, Deceased, Appellee.

1. TRIAL—QUESTION FOR JURY ARISES WHERE THERE IS CONFLICT IN EVIDENCE.—Where there is conflict in evidence, weight and credibility to be given witnesses is always question for jury.

---

1. See 28 R. C. L. 657.

2. Physicians and Surgeons—Negligence in X-ray Treatment Held for Jury.—Where defendant, in action for negligent X-ray treatment, testified measured distance from target to skin was fifteen inches, and another witness estimated distance at ten to twelve inches, experts having testified that treatment given would be improper at latter distance, evidence of negligence *held* sufficient to take case to jury.

3. Physicians and Surgeons—Negligence in Treatment must be Cause of Death to Warrant Recovery.—Where plaintiff's intestate, afflicted with cancer, died a few months after taking X-ray treatment, in order to recover from doctor, it must not only be shown he was negligent in treatment, but also that injury received in such treatment caused or hastened death.

4. Physicians and Surgeons—Whether X-ray Treatment Caused Death Held for Jury.—Where two doctors testified that cancer caused death, but evidence showed swelling and blisters, loss of sleep, and intense pain followed X-ray treatment, question whether burn received in treatment caused or contributed to death *held* properly submitted to jury.

5. Witnesses — Physician may Testify Concerning Patient by Answering Hypothetical Questions Solely on Facts Related Therein.—Physician is not disqualified to testify as expert concerning patient's ailment, when he can disregard knowledge acquired in attending such patient and make answer solely on facts related in hypothetical questions.

6. Witnesses—Requiring Doctor to Qualify as Expert to Testify Concerning Patient, by Showing He Could Disregard Own Opinion, Held Proper.—Where doctor, testifying as expert concerning patient, admitted on cross-examination that his answers were based partly on his own opinion, court rightly required similar subsequent witnesses to be qualified by showing they could disregard own opinion based on treatment of patient.

7. Physicians and Surgeons — Degree of Care Required Stated. — Physician or surgeon is required to possess skill and learning which is possessed by the average members of the medical profession in good standing, and to apply that skill and learning with ordinary and reasonable care.

8. Evidence—Testimony as to Degree of Care Required of Physician Held Inadmissible.—In action against doctor for negligence in giving X-ray treatment, expert witness could explain customary and correct method of X-ray treatment to guide jury in determining whether defendant used ordinary care, but they could not testify as to degree of care required, for that was question of law.

7.  See 21 R. C. L. 381.

9. PHYSICIANS AND SURGEONS—PHYSICIAN OPERATING X-RAY MUST EXERCISE SAME CARE AS GENERAL PRACTITIONER.—Degree of care required of physician in good standing operating X-ray machine is same as physician and surgeon in general practice.

10. TRIAL—INSTRUCTION SUBMITTING DEGREE OF CARE REQUIRED OF PHYSICIAN TO JURY HELD ERROR.—In action for negligence in giving X-ray treatment, instruction that defendant would be held to high degree of care, if jury found that such was degree of care usually exercised by physician under similar circumstances, *held* error as abstract.

---

See (1, 2) 22 **C. J.**, p. 732, n. 89; p. 738, n. 83; 30 **Cyc.**, p. 1588, n. 83; 38 **Cyc.**, p. 1516, n. 57; p. 1518, n. 69; p. 1537, n. 45. (3, 4) 30 **Cyc.**, p. 1575, n. 52; p. 1588, n. 83. (5, 6) 40 **Cyc.**, p. 2388, n. 77, 78. (7, 8) 22 **C. J.**, p. 663, n. 30; p. 679, n. 32; 30 **Cyc.**, p. 1570, n. 19. (9, 10) 30 **Cyc.**, p. 1570, n. 19; 38 **Cyc.**, p. 1618, n. 36. (10) 30 **Cyc.**, p. 1590, n. 94.

APPEAL from a judgment of the Superior Court of the County of Pima. W. R. Chambers, Judge. Judgment reversed and cause remanded, with the direction that defendant be granted a new trial.

Messrs. Curley & Pattee, for Appellant.

Messrs. Richey & Richey and Mr. Elwood B. Frawley, for Appellee.

ROSS, J.—The plaintiff, claiming that her intestate came to her death by reason of a negligent and unskillful X-ray treatment, administered by defendant, brought this action for damages. In her complaint she relied upon five grounds of negligence, as follows:

"(1) That defendant administered said treatment to decedent without first determining decedent's susceptibility thereto, by reason of which said treatment was too strong and too severe;

"(2) That the tube and bulb of said machine was placed too close to decedent's body;

---

9. Liability for injury by X-ray, see notes in 13 **A. L. R.** 1414; 26 **A. L. R.** 782; 43 **L. R. A. (N. S.)** 734; 28 **L. R. A. (N. S.)** 262. See, also, 21 **R. C. L.** 386.

"(3) That proper covering and protection was not given decedent's abdomen, groins, thighs, and legs;

"(4) That said rays were too intense and too severe; and

"(5) That defendant failed to properly supervise said treatment, and remained absent therefrom for a period of more than one-half hour, leaving with decedent only her minor daughter, who was, as defendant then knew, or should have known, unskilled and without knowledge of X-ray machines and treatment, whereby said treatment was of too long duration."

The defendant's answer set out that plaintiff's intestate was affected with sarcoma in the left groin, of such advanced state as, after consultation with two other physicians, it was concluded inadvisable to operate thereon but proper and necessary to treat by X-ray in an effort to retard its growth, and, if possible, destroy such growth; "that, acting upon such determination, and at the request of said decedent, defendant did administer one treatment to decedent with an X-ray machine; that such treatment was administered with due and proper care and skill, and in no greater dosage than was necessary in order to properly treat decedent, and to reach and affect the growth with which she was then suffering."

A jury trial resulted in a verdict and judgment for $1,000. Defendant moved for a new trial, which was denied. He appeals from the judgment, and assigns a great number of errors.

It is very earnestly contended by defendant that his motion for a directed verdict should have been granted, for two reasons: First, because there was introduced no evidence showing that he was careless or unskillful in giving deceased the X-ray treatment; and, second, there was not shown any causal connection between the treatment and the death of intestate. The motion was denied, and the court, in submitting the case to the jury, did so on the assumption that

there was evidence tending to support all the charges of negligence except the first one. This one was expressly withdrawn from the jury, and they were told that, if they found any of the other charges was established by a preponderance of the evidence, plaintiff should recover. The nature of the question makes it necessary to state at some length the facts as developed by the evidence, and then point out as best we can their bearing upon the allegations of the complaint.

On March 19, 1923, plaintiff's intestate called on the defendant for his professional service and advice. It seems that she had been examined theretofore by Drs. C. A. Peterson and Victor M. Gore, who had diagnosed her ailment as sarcoma. Under the instructions of these doctors, the intestate went to defendant, an X-ray operator and physician with offices in same building. There is no dispute but that she was afflicted with sarcoma, a most virulent and malignant type of cancer, and that it was at the time of about twelve months' growth. It was determined that the time for a surgical operation was past, and that, if intestate had any chance, it was from the X-ray treatment. The latter treatment was thereupon administered by Dr. Butler.

At the time of the treatment, the deceased was thirty-six years old. She was in general good health. She had been able until then to do her housework, including the washing, ironing and scrubbing of floors, and could walk and exercise physically without appearing tired or exhausted, and had no physical ailments outside of the swelling in her groin. She had washed and scrubbed on the day of the operation. The growth had not bothered her except when it came in contact with something, and then it would hurt her and make her sick.

After the operation she was unable to do what she had formerly done. She was in intense pain all the time, both night and day. During the treatment she complained of burning pains in her stomach and of sickness of the stomach, and that night she suffered so much pain that Dr. Peterson was called. The next morning her stomach was swollen, and the part of her body exposed to the X-ray was red, and in two or three days blisters began to form and then break. The surface that had been exposed to the rays began to slough off so that the center of the wound became deeper and deeper. The edges healed some. Her leg and foot swelled so large that blisters formed thereon. The swelling in her stomach did not abate, and she complained most of the time of pains in her stomach. She had received what is known as a "third-degree burn." The first two months after the operation she would lie down at night, but did not sleep well; she was up and down night and day. Thereafter she never went to bed, but sat in a rocking-chair with her feet on the side of her bed. The last three months before she died she was not able to eat anything except milk, eggnog and things like that. For a month and a half before she died her face was paralyzed. She died on August 23, 1923, less than five months after the treatment.

It is the contention of the plaintiff that her intestate's death was caused or hastened by the treatment, and that such treatment was negligently and unskillfully administered.

The defendant's contention is that intestate's death resulted from the cancer solely.

The plaintiff, as part of her case, called Dr. Butler for cross-examination and had him explain how the X-ray treatment was administered. His statement was, in effect, as follows: The patient was placed on

the X-ray operating table. The place to be treated was bared, and the parts of the body not to be exposed to the X-ray were protected by a cover of lead-impregnated rubber. The aperture was a parallelogram and of sufficient size to expose the large growth and leave a margin for the smaller growths. The X-ray tube was of the Coolidge type; it was a standard tube. The voltage used was between eighty-five and ninety-five thousand volts. The tube was adjusted to "moderately hard." The target or focal point of tube was placed fifteen inches from the skin or surface of growth. The strength of the current applied was five milliamperes. The filters used were leather and aluminum, and were standard for a fifteen-inch distance between the focal point of the tube and the skin. The treatment lasted thirty minutes.

The only expert testimony upon the question as to whether the above-described treatment was proper or not was that of the defendant, Dr. Butler, and Dr. R. J. Callander. Dr. Butler said the treatment he gave, and as outlined, was a proper one; and Dr. Callander, testifying as an X-ray expert, said such treatment was proper. He added he would expect such a treatment to produce erythema, or a flush of the skin, but no more.

According to these experts, defendant was not guilty of negligence or want of skill. In giving the treatment, he had exercised the care and skill usual among physicians and surgeons in good standing under similar circumstances—the standard to judge him by in the use of the X-ray as a remedial agent. If the operation was performed as detailed by defendant, he fully met his legal obligation to his patient (*Henslin* v. *Wheaton,* 91 Minn. 219, 103 Am. St. Rep. 504, 1 Ann. Cas. 19, 64 L. R. A. 126, 97 N. W. 882), and

every charge of negligence or lack of skill was refuted.

However, if there was evidence as to the manner in which defendant administered the treatment in conflict with his testimony, and tending to show that in some essential the treatment was not given as defendant stated, the expert testimony to that extent would fail, and a question of fact for the jury arise. The value of an answer to a hypothetical question may be destroyed, if the facts or some of the facts upon which it is based are not conceded or proved as a part of the case. While defendant stated the distance from the target to the skin by measurement to be fifteen inches, witness Margaret Robson, who was the only person present aside from the defendant during the treatment, testified that such distance was from ten to twelve inches. It is argued by defendant that this testimony does not create a conflict, because defendant's figures were the measured distance, whereas Robson was only estimating the inches between the given points. Defendant's words were:

"In setting my apparatus and taking my spark distance at fifteen inches, I measured as closely as possible to the estimated the center of the growth, so that the distance from the target to the skin was fifteen inches, and used the current which I estimated would have its greatest effect in the center of the growth. I measured to the highest part nearest the target. The skin distance from the top of the cancerous condition to the target was fifteen inches. That was a proper treatment; I should do the same thing again if the same conditions presented themselves."

A positive statement of the distance, arrived at by actual measurement, certainly should be taken against an estimate or guess and, if the question involved only which of the two methods was the more accurate, we would be willing to agree with defendant

that no conflict was created. But the question also involves the veracity of the witnesses. The jury might have concluded defendant did not measure the distance at all, and that his statement that he did was not true. Where there is a conflict in the evidence, the weight and credibility to be given the witnesses is always a question for the jury. If the jury believed Robson's testimony, the length of the treatment should have been limited, according to defendant's own testimony, to between thirteen and fourteen minutes. He also said:

"It would not have been a proper treatment to have applied the treatment to Mrs. Holloway for thirty minutes at a ten-inch distance. I estimated that the fifteen-inch distance should be thirty minutes. . . . "

If the target was only ten or twelve inches from the skin, under the expert testimony, the treatment was improper, and the defendant in its administration failed to use the care and skill usually exercised by the members of his profession similarly situated. So we conclude that there was sufficient evidence of negligence or want of skill to take the case to the jury.

The negligence or want of skill in administering the X-ray treatment, even if established, is not enough to entitle the plaintiff to recover. She must go further and show that the injury suffered in such treatment caused the death of her intestate or hastened such death. The defendant contends that all the evidence was to the effect that intestate died from cancer. It is true that two physicians testifying as experts said that in their judgment Mrs. Holloway died of sarcoma or cancer, and no one testified that the X-ray burn caused her death, or hastened it, or contributed to it. Notwithstanding, we think the physical facts justified the court in submitting to the jury the question as to whether the burn received in the treatment caused or contributed to the death

of plaintiff's intestate. The swelling of her stomach and leg, the blisters thereon, her inability to rest, loss of sleep, and continuous pain and suffering, all came immediately after the burn, and doubtless were caused thereby. Naturally it would seem their effect would be to lower her vitality and to hasten her death. The death certificate introduced by defendant gave the cause of death as "carcinomatic pelvic organs and ulcer." There was but one ulcer on the body of the deceased, and that was the X-ray burn which the certificate shows caused or contributed to the death of the intestate.

Error is charged in the court's refusing to permit certain of defendant's expert witnesses to answer hypothetical questions. These witnesses had been intestate's physicians, and as such had obtained knowledge of her condition and ailments. Any information that came to them while acting in that capacity was confidential and privileged. However, the rule seems to be that a physician who has attended a party is not disqualified to testify as an expert concerning such party's ailment, when he can disregard what he has learned in communicating with and examining such patient, and make his answers solely upon the facts as related in hypothetical questions. *Triangle Lbr. Co.* v. *Acree,* 112 Ark. 534, Ann. Cas. 1916B, 773, 166 S. W. 958; *Crago* v. *City of Cedar Rapids,* 123 Iowa, 48, 98 N. W. 354; 40 Cyc. 2388. We think from what happened the learned trial court recognized this rule. The defendant had asked one of such witnesses hypothetical questions, and before he had answered he had been admonished by plaintiff's attorney several times that his answers should be "from the history as detailed by Dr. Butler alone." On cross-examination, this witness was asked if his testimony was based on what he had heard Dr. Butler say while testifying, and he answered: "Well, in

conjunction with my opinion also. . . . What I saw
of her, yes.'' The next three witnesses who had
professionally attended intestate were allowed to an-
swer, without objection, preliminary questions as to
being present and hearing Dr. Butler detail the his-
tory of intestate's case. But when it was made to
appear they had examined and advised intestate as
to her case, plaintiff objected to their testifying as
experts, ''unless it is shown by the witness that he
can disassociate any idea he may have received from
an examination and advice in regard to this burn
and the sarcoma. . . . '' The court ruled: ''Upon
the present showing, the objection is sustained.'' In
view of the developments in connection with the first
of such witnesses, we cannot say the court erred in
requiring the defendant to qualify his witness be-
fore proceeding to question him as an expert. While
perhaps this is not in accord with the announced rule
(*Edington* v. *Aetna Life Ins. Co.*, 77 N. Y. 564), we
think if defendant had felt certain his witnesses could
qualify he would have asked them the necessary ques-
tions. After all the question was whether the wit-
nesses were qualified or not, and we can see no par-
ticular advantage or disadvantage in requiring the
plaintiff to qualify his experts in that respect. At
all events, the discretion of the court in that regard
we would not disturb.

The plaintiff called Dr. Callander as a witness, and
asked him this question: ''Now, Doctor, in the use of
an X-ray machine, in administering X-ray treatments,
called deep therapy, the highest degree of care should
be exercised, . . . should it not?'' The court per-
mitted the witness to answer the question, over an
objection to the effect that the degree of care in such
cases was a question of law, the court stating that
he thought it a question of fact, and the witness an-

swered: "He ought to exercise all the care he can."
Consistent with the above ruling was the following in-
struction to the jury:

"However, if you should believe from a preponder-
ance of the evidence that the reasonable care and skill
required of, or usually exercised by, physicians in
good standing who are operating X-ray machines is a
high degree of care, then the defendant in this case
would be held to a high degree of care."

Both of the above rulings are assigned as error.
The degree or measure of care to be exercised by a phy-
sician or surgeon in the practice of his profession is
very definitely and well settled. You will find it stated
over and over in the decisions and in the text-books,
and in all it is practically the same. The statement
of the rule as made by the Supreme Court of New
York in *MacKenzie* v. *Carman,* 103 App. Div. 246, 92
N. Y. Supp. 1063, has been extensively quoted and
approved and we use it as a fair expression of the
law. It is as follows:

"The law thus requires a surgeon to possess the
skill and learning which is possessed by the average
member of the medical profession in good standing,
and to apply that skill and learning with ordinary
and reasonable care. He is not liable for mere error
of judgment provided he does what he thinks is best
after a careful examination. He does not guarantee
a good result, but he promises by implication to use
the skill and learning of the average physician, to
exercise reasonable care, and to exert his best judg-
ment in the effort to bring about a good result."

See, also, *Loudon* v. *Scott,* 58 Mont. 645, 12 A. L. R.
1487, 194 Pac. 488. The degree of care to be exer-
cised is therefore a question of law. Whether defend-
ant's acts meet the standard of care required is a
question of fact.

Expert witnesses may well be asked to explain the
customary and correct methods employed by medical

men in good standing in administering X-ray treatments, for the purpose of guiding the jury in determining whether in the given case the defendant exercised ordinary care. *Samuels* v. *Willis,* 133 Ky. 459, 19 Ann. Cas. 188, 118 S. W. 339. Such customary and correct methods so detailed could have no other purpose than to show the jury how the profession acts when exercising ordinary care and caution, and to establish for the jury's guidance the standard or degree of care to be employed by them in arriving at their verdict. Now, if the witness may be permitted to state that the degree of care in such case should be of the "highest," it would give the jury another standard of duty, and if the jury should be of the opinion that the method used, although customarily and ordinarily used by the profession, was not the best, it could so decide. In other words, there would be no standard.

There was no evidence in the record upon which to base the instruction, unless it be the answer to the improper question to the effect that the X-ray operator "ought to exercise all the care he can." The degree of care of "a physician in good standing, operating X-ray machines," is the same as physicians and surgeons in the general practice. This has been numerously decided. *Hayes* v. *Lufkin,* 147 Minn. 225, 179 N. W. 1007; *Hamilton* v. *Harris* (Tex. Civ. App.), 223 S. W. 533; *Sweeney* v. *Erving,* 35 App. D. C. 57, 43 L. R. A. (N. S.) 734; *Runyan* v. *Goodrum,* 147 Ark. 481, 13 A. L. R. 1403, 228 S. W. 397; *Street* v. *Hodgson,* 139 Md. 137, 115 Atl. 27; *Antowill* v. *Friedmann,* 197 App. Div. 230, 188 N. Y. Supp. 777. In *Stemons* v. *Turner,* 274 Pa. 228, 26 A. L. R. 727, 117 Atl. 922, the court, after stating the rule that a physician or surgeon "is only required to exercise such

29 Ariz.—27

reasonable skill and diligence as is ordinarily exercised in his profession,'' said:

" . . . The trial judge announced an entirely different standard by instructing the jury . . . that it was the duty of defendant to use a 'high' degree of care, whereas he was only required to use the ordinary care exercised under like circumstances, and a higher degree of care only when compared with that called for in less important matters.''

In the case of *Wilk* v. *Black*, 188 Mich. 478, 154 N. W. 561, the court gave the following instruction:

"The physician is not required to possess or exercise the highest degree of care and skill known to the profession in order to relieve him from liability. . . . ''

And in *Hales* v. *Raines*, 146 Mo. App. 232, 130 S. W. 425, the court instructed as follows:

" . . . That the defendant [physician] was not bound to exercise extraordinary diligence or care in treating the plaintiff, but only reasonable care.''

In this last case it was said:

"We gather from the authorities that the correct rule is, that a physician and surgeon when employed in his professional capacity is required to exercise that degree of knowledge and skill and care which physicians and surgeons practicing in similar localities ordinarily possess. In other words, a physician is held to that care and skill which was exercised generally by physicians of ordinary care and skill in his and similar communities. The physician is not chargeable with negligence for failure to use his best skill and ability if he uses the care and skill which is exercised generally by physicians of ordinary care and skill in similar communities [citing cases].''

The instruction, besides being abstract, announced an incorrect rule of law.

The several other assignments of error we do not discuss, either because we are satisfied there is

nothing to them, or because it is very improbable they will arise in a retrial of the case.

The judgment is reversed and the cause remanded with the direction that defendant be granted a new trial.

McALISTER, C. J., and LOCKWOOD, J., concur.