588 P.2d 326

Katherine GASTON and Paul Gaston, wife and husband, Appellants,

v.

Willard S. HUNTER, Howard H. Johnston, Arizona Orthopedists, P. C., a corporation, Baxter Laboratories, Inc., a corporation; and Travenol Laboratories, Inc., a corporation, Appellees.

No. 1 CA–CIV 3093.

Court of Appeals of Arizona, Division 1, Department A.

Aug. 29, 1978.

Rehearings Denied Oct. 24, 1978.

Review Denied Nov. 21, 1978.

Herring & Stephan by Norman Herring, Phoenix, and David M. Harney, Los Angeles, Cal., for appellants.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P. C. by Harry J. Cavanagh and Donald E. Dyekman, Phoenix, and Jennings, Strouss & Salmon by William T. Birmingham, Phoenix, for appellees Hunter, Johnston and Arizona Orthopedists.

Snell & Wilmer by Loren W. Counce, Jr., Phoenix, for appellees Baxter and Travenol.

## OPINION

HAIRE, Presiding Judge.

Many questions are raised in this appeal from a judgment resulting from a jury verdict for the defendants in a medical malpractice and products liability case. The central issues in the trial court related to the liability of the defendant doctors and the defendant drug manufacturers for physical ailments suffered by the plaintiff after the defendant doctors treated plaintiff's back by means of a relatively novel procedure known as "chemonucleolysis", which involved an injection of chymopapain, an investigational drug manufactured by the defendant drug companies.

The appellant Katherine Gaston, plaintiff in the trial court, had a history of intermittent back pain. On October 16, 1970, she experienced severe pain in her low back and legs. She consulted her doctor, an internist, who prescribed some pain medication and recommended that she see an orthopedic specialist. When the recommended orthopedist could not immediately see her, she contacted appellee Dr. Willard Hunter, an orthopedic surgeon, and made an appointment for November 2, 1970.

After examining Mrs. Gaston, Dr. Hunter made a diagnosis of intervertebral disk herniation at two levels. He suggested conservative treatment, and Mrs. Gaston was admitted to St. Luke's Hospital that day for pelvic traction. She remained in the hospital for approximately eight days, and was then told to use traction at home. Unfortunately, her condition did not respond to this conservative treatment, and on December 14, 1970, Dr. Hunter discussed with her the possibility of performing a diskography and chemonucleolysis.

We must digress here to describe the contemplated procedure and identify other parties to this litigation. When an intervertebral disk is bulging outward, it may press against some of the many nerves in the area of the spine and cause pain. If the situation is severe, a normal medical response is surgery: a laminectomy with excision of the offending disk. The drug chymopapain was designed to provide an alternative to back surgery. Chymopapain is an enzyme derived from the papaya. It was manufactured by Travenol Laboratories, a subsidiary of Baxter Laboratories, under the trade name "Discase". Chemonucleolysis is a procedure whereby chymopapain is injected into a bulging disk. The theory was that the drug would dissolve some of the center part of the disk (i. e., the nucleus pulposus), the pressure would be relieved, and the bulging or herniated disk would contract and no longer press upon nerve roots.

When this operation was discussed with the plaintiff, chymopapain had not been approved for general use by the Food and Drug Administration. However, the drug could be distributed to selected physician investigators as an "investigational" drug. Because an investigational drug is still in the clinical testing phase, the investigators using the drug had to operate under close supervision of the drug's sponsor (manufacturer) and had to carefully monitor the results experienced in using the drug. Dr. Howard Johnston, who practiced medicine with Dr. Hunter in the professional corporation Arizona Orthopedists, was an authorized investigator for chymopapain at the time of the plaintiff's injection. Dr. Hunter was not so authorized.

The procedures to be performed on Mrs. Gaston involved placing the patient on her

side on the operating table under a general anesthetic. Needles would then be inserted into the nucleus pulposus of each suspected troublesome disk, using a lateral approach (*i. e.*, from the side). The insertion of the needles would be monitored on fluoroscopic equipment to insure proper placement. A radio-opaque dye would then be injected into the disks and X-rays taken. By this procedure (diskography) ruptured disks would be revealed through the leakage of dye. These X-rays would also show the placement of the needles in the disk space. Without moving the needles, chymopapain would then be injected into the affected disks to, hopefully, dissolve some of the nucleus pulposus.

Mrs. Gaston signed a consent form for diskography and chemonucleolysis, and a form entitled "The Use of Chymopapain in Disc Disease", which explained the investigational nature of the drug.

The injection was performed on December 18, 1970. Following the operation, Mrs. Gaston experienced some temperature elevation, disorientation, difficulty in urination, pain, restlessness, and diarrhea. Doctors Hunter and Johnston were not worried, however, until December 23, 1970, when her temperature suddenly spiked to over 103 degrees. An immediate blood culture was ordered. When the laboratory report was returned a couple of days later, it revealed the presence of E-coli bacteria.

Because of abdominal pain, a general surgeon was called in. Gallbladder disease was suspected and the surgeon performed an exploratory laparotomy on December 24th. The only finding, however, was "mesentary adenitis", which is inflammation of the lymph nodes in the membranous tissue which holds up the intestines.

While recovering from this surgery, and on the same day, a spinal tap was performed, revealing E-coli infection in the cerebrospinal fluid. She was immediately placed on antibiotics and this bacterial meningitis was eventually controlled.

Mrs. Gaston, however, suffered additional complications, which necessitated several more operations. She was left with an abnormal gait, some numbness in her feet and toes, inability to control her bladder or bowels, and constant pain.

Mrs. Gaston sued Drs. Hunter and Johnston and Arizona Orthopedists (collectively referred to as the defendant doctors), St. Luke's Hospital, Baxter Laboratories and Travenol Laboratories.[1] The plaintiff contended that the defendant doctors were negligent in selecting her as a candidate for chemonucleolysis, in performing the injection, and in rendering post-operative care. She contended the doctors operated on her without first obtaining an informed consent, a claim sounding in both negligence and battery. Also, since the procedure of chemonucleolysis was investigational, she argued that the defendant doctors were engaged in an ultrahazardous activity and that they should be absolutely liable for any adverse results. The plaintiff claimed that St. Luke's Hospital was negligent in failing to supervise the conduct of the investigational procedure of chemonucleolysis, in not providing a sterile operating theater and equipment, and in not keeping adequate records of plaintiff's condition following the injection. She claimed that the defendant drug companies were negligent in the manufacturing and testing of chymopapain, and in failing to warn of its dangers. She also asserted claims against the defendant drug manufacturers based on breach of warranty and strict tort liability. Finally, she contended that the drug companies, as well as the defendant doctors, should be absolutely liable because the distribution and use of investigational drugs is an ultrahazardous activity.

The defendant drug manufacturers contended that none of the adverse physical ailments suffered by plaintiff after the chemonucleolysis procedure could have resulted from that procedure if properly performed by the defendant doctors, and that, in any

1. Mrs. Gaston's husband, Paul Gaston, sued these same defendants for loss of his wife's services and consortium. Throughout this opinion we will refer only to a single plaintiff, Mrs. Gaston, since Paul Gaston's claims must be resolved identically to hers.

event, there was no showing that they were negligent in their investigation, manufacturing or supplying of the drug involved.

The trial of this matter lasted in excess of three months. At the close of the plaintiff's case, the trial court directed a verdict for St. Luke's Hospital. The case against the defendant doctors was submitted to the jury on the issues of malpractice (negligence) and battery. The case against the drug companies was submitted on the theory of negligence. The judge did not instruct the jury on plaintiff's strict tort liability and breach of warranty claims against the drug companies, and the court refused to give an instruction on absolute liability against either the defendant doctors or drug companies. The jury returned verdicts in favor of all the defendants. Plaintiff does not appeal the directed verdict for St. Luke's Hospital, but she contends the verdicts in favor of the drug companies and the doctors must be reversed. On this appeal she asserts a multitude of errors involving the exclusion of evidence, judicial misconduct, and improper jury instructions.

We hold that multiple errors were committed which necessitate a new trial against the defendant doctors on the issue of professional negligence. However, these errors did not involve the issue of informed consent, and no new trial is required on either the negligence theory or the battery theory of informed consent. We find no errors on any of the plaintiff's claims against the drug companies which would justify reversal, and the verdicts for Baxter and Travenol may stand. During the course of this opinion, additional facts will be developed when necessary to resolve the issues raised by appellant.

## I. CLAIMED ERRORS RELATING TO THE TRIAL COURT'S RULINGS WHICH EXCLUDED EVIDENCE OF CHYMOPAPAIN INJECTIONS OCCURRING AFTER THE DATE OF PLAINTIFF'S INJECTION

Plaintiff contends that the trial court erroneously excluded a variety of evidence on the basis of an arbitrary ruling that no evidence would be received concerning the use of chymopapain subsequent to the date of the plaintiff's injection on December 18, 1970. Before discussing the precise nature of the excluded evidence, it is necessary to examine the genesis and rationale of the court's imposition of the December 1970 cutoff date.

Prior to trial, Baxter and Travenol Laboratories by motion asked the court to preclude the mention of "Adolph's Meat Tenderizer" at trial, to preclude any mention that the Food and Drug Administration (FDA) had not approved chymopapain for general commercial marketing, and to preclude testimony of any adverse reactions involving chymopapain subsequent to December 18, 1970. After hearing arguments, the court prohibited the use of the brand name "Adolph's Meat Tenderizer" at trial. As to FDA non-approval and post-1970 adverse experiences with the drug, the judge reserved ruling, but he warned:

"I expect counsel to convince me that what happened to other people subsequent to this event has a bearing on this case."

In his opening statement, plaintiff's counsel alluded to the similarity between chymopapain and meat tenderizer, and further commented that despite a ten-year "experiment", chymopapain still had not attained the status of an FDA approved drug.

Because of these statements, Baxter and Travenol, joined by the defendants Hunter and Johnston, moved for a mistrial. The court heard brief arguments, but initially withheld its ruling on the motion, giving counsel another day in which to present legal authority. To support the admissibility of evidence that chymopapain had not, to the time of trial, been approved by the FDA, plaintiff's counsel cited authorities to the effect that evidence of the existence of a condition subsequent to an event in question is admissible to prove the existence of the same condition at the time of the event. The court was not persuaded and declared a

mistrial[2] on the basis of plaintiff's mention of the current FDA status of chymopapain. The court's ruling was not limited to the subject of FDA non-approval, however:

"I want the record clear that the matter of what happened to Chymopapain as far as the Federal Drug Administration approval or use upon other patients subsequent to the events with which we are concerned, will not be alluded to or testified to in the course of this trial."

The court went on to clarify its reason for so ruling:

"What happened afterwards can in no way constitute a matter of notice, and a basis upon which I believe the individuals here can be charged with negligence."

Plaintiff's counsel then inquired whether the defendants' witnesses would also be precluded from testifying concerning any injections of chymopapain subsequent to December 18, 1970. When the court indicated that its ruling would apply equally to all witnesses, counsel for the *drug companies* protested that evidence of post-1970 injections might be relevant to prove the efficacy of chymopapain, assuming there were no changes in the drug in the interim. The court again stated its ruling and the rationale behind it:

"As far as I am concerned, I would hold defense to the same thing. I'm not going into that. I am thinking in terms of chargeability of notice, of the situation at the time of the procedure on Kay Gaston, both by Baxter-Travenol and the doctors involved."

On appeal, plaintiff contends that the court's imposition of the cutoff date caused the following errors in the exclusion of evidence: (1) Dr. C. Norman Shealy was of the opinion that chymopapain is an "exceedingly toxic, necrotizing" substance. He was precluded from stating that his opinion was partially based on his observations of patients who had been injected with chymopapain, because he was unable to show sufficient experience with patients who had been injected prior to the cutoff date. (2) Dr. Henry Dodge was precluded from testi-

fying to various adverse reactions he observed in patients who had been injected with chymopapain because he could not establish that any of the injections occurred prior to December 18, 1970. (3) The plaintiff, as above noted, was not permitted to present evidence that chymopapain remained unapproved by the FDA at the time of trial. (4) Testimony was prohibited concerning two documents of Baxter Laboratories which gave statistics on various adverse reactions associated with chemonucleolysis, and (5) Dr. Hunter was not permitted to testify whether he ever reported plaintiff's case to the FDA, and Dr. Johnston was not permitted to state whether *Travenol* ever reported the plaintiff's case as an adverse result.

Throughout the trial, the court was consistent in its reasoning that evidence relating to the use of chymopapain after December 18, 1970 was inadmissible because it would not show that the defendants had notice, and thus could not tend to prove that their actions prior to that date were negligent. It is obvious that the court considered this the only use or purpose of post-1970 evidence, and we find no indication in the transcript that plaintiff ever suggested to the court that this evidence could be relevant for other purposes. Plaintiff now contends, however, that post-1970 use of chymopapain would be relevant and admissible to prove that chymopapain is a dangerous and defective drug, and to show that plaintiff's injuries were caused by an injection of this drug.

◼ Defendants Travenol and Baxter argue that even if the court erred in imposing the December 18, 1970 cutoff date, such error was invited by the conduct of the plaintiff, and plaintiff should not be permitted to claim on appeal that any evidence was wrongfully excluded as a result of the cutoff date. The drug companies cite two cases for the proposition that the plaintiff may not appeal an "invited error", *Bohmfalk v. Vaughan*, 89 Ariz. 33, 357 P.2d 617 (1960) and *Schlecht v. Schiel*, 76 Ariz. 214,

---

2. The propriety of the granting of this mistrial is not an issue on this appeal.

262 P.2d 252 (1953). In those cases, the complaining party actually *requested* the action which was later assigned as error. In the present case the court's ruling was the result of Travenol's motion for mistrial, and Travenol's prior motion *in limine*. As we have indicated, after the court announced its ruling, counsel for plaintiff inquired whether the defendants would also be precluded from introducing evidence concerning successful injections of chymopapain subsequent to the cutoff date. The trial court answered in the affirmative. Concededly, plaintiff's counsel accepted this ruling with uncharacteristic acquiescence and meekness. However, we do not feel that counsel's failure to protest more vigorously in and of itself rises to the level of invited error.

■ Although we are unable to say that the plaintiff actually invited the trial court into error, the record shows that plaintiff made no offer of proof concerning the relevance of the use of chymopapain after December 18, 1970, and this, we feel, precludes plaintiff from successfully appealing the exclusion of any evidence based on the court's cutoff date.

■ In this case, the judge was correct that evidence concerning the post-1970 use of chymopapain would be inadmissible as to the issues of notice or knowledge,[3] although the same post-1970 evidence might well have been relevant to show that chymopapain was a defective product[4] and that plaintiff's injuries were caused by the drug.[5] It is generally true that evidence which is admissible for one purpose or against one party is not to be excluded merely because it may be inadmissible for another purpose or against another party. *E. g., Steele v. Vanderslice*, 90 Ariz. 277, 367 P.2d 636 (1961); *Cavanagh v. Ohio Farmers Insurance Co.*, 20 Ariz.App. 38, 509 P.2d

1075 (1973). However, it is equally true that evidence which is inadmissible for the purpose offered should be rejected, notwithstanding that the evidence could have been received for another purpose or under a different theory. *See Purvis v. Silva*, 94 Ariz. 62, 63 n. 1, 381 P.2d 596, 597 n. 1 (1963); *State v. George*, 95 Ariz. 366, 390 P.2d 899 (1964); *Arizona Water Co. v. City of Yuma*, 7 Ariz.App. 53, 436 P.2d 147 (1968); *see also Alires v. Southern Pacific Co.*, 93 Ariz. 97, 113, 378 P.2d 913, 924 (1963) (Jennings, J., specially concurring).

"All evidence upon a trial is offered with some purpose in mind but it is not incumbent on the trial judge to speculate as to its propriety. Rather it is the duty of the one offering the evidence to inform the court as to its nature, purpose and legal connection with the issue involved." *State v. Daymus*, 90 Ariz. 294, 301, 367 P.2d 647, 652 (1961).

The following cases have also imposed on the party offering evidence a duty to inform the trial court how the evidence is relevant to the issues of the case: *Sage v. State*, 22 Ariz. 151, 195 P. 533 (1921); *Lemke v. Mueller*, 166 N.W.2d 860 (Iowa 1969); *Commonwealth v. Geagan*, 339 Mass. 487, 159 N.E.2d 870, *cert. denied*, 361 U.S. 895, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959); *State v. Feltrop*, 343 S.W.2d 36 (Mo.1961); *Powell v. Powell*, 554 S.W.2d 850 (Tex.Civ. App.1977). A procedurally similar case is *Lemke v. Mueller, supra*. In that case, the defendant moved to exclude a certain type of evidence. When the trial court, pursuant to an earlier ruling granting defendant's motion, ordered some testimony of one of plaintiff's witnesses stricken, plaintiff appealed. The Iowa Supreme Court held that the plaintiff could not claim error in the exclusion of this testimony, because "after defendant's objections had been sustained

---

3. *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 470 P.2d 135 (1970).

4. *See Slow Development Co. v. Coulter*, 88 Ariz. 122, 353 P.2d 890 (1960); *Montgomery Ward & Co. v. Wright*, 70 Ariz. 319, 220 P.2d 225 (1950); *Ginnis v. Mapes Hotel Corp.*, 86 Nev. 408, 470 P.2d 135 (1970).

5. Evidence of later accidents can be relevant to show that the plaintiff's injury was caused by a defective product or dangerous condition. *Carter v. Yardley & Co.*, 319 Mass. 92, 64 N.E.2d 693 (1946).

plaintiff never made known to the trial court the legitimate purpose now claimed for its admissibility." 166 N.W.2d at 871.

Plaintiff contends that an offer of proof is not essential to appeal the exclusion of evidence where the purpose and substance of the expected testimony is obvious or where the court has ruled broadly that no evidence in support of a certain theory or fact is admissible. *See* M. Udall, Arizona Law of Evidence § 13, at 31 (1960); *Peterson v. Sundt*, 67 Ariz. 312, 195 P.2d 158 (1948). In the present case, however, the purpose of the proffered evidence was not obvious. In fact, by his silence plaintiff allowed and encouraged the trial court to treat the evidence as being offered solely for an improper purpose. We are not inclined to speculate on plaintiff's purpose in offering the evidence excluded by the court's cutoff date, and we hold that under the circumstances of this case, plaintiff should not be permitted to assert on appeal that the excluded evidence was relevant in ways which were not disclosed to the trial court.

■ The above discussion primarily relates to the items of evidence numbered (1) and (2) above, the testimony of Drs. Shealy and Dodge concerning their post-1970 experiences with patients who had received injections of chymopapain. Plaintiff made a stronger attempt to show the admissibility of the FDA's continuing failure to approve the drug for commercial use. However, even assuming plaintiff made a sufficient offer of proof as to chymopapain's FDA status, we hold that the trial court did not err in excluding such evidence. The FDA status of chymopapain subsequent to the Gaston injection is simply irrelevant to the issues in this case. It would have no tendency to prove negligence on the part of the doctors or the drug companies, it would not show that the plaintiff's injuries were caused by the drug, and, without more, it would not tend to prove that chymopapain

was a defective, unreasonably dangerous product in December 1970.

Items (4) and (5) also deserve some additional discussion since they have only a tenuous relation to the 1970 cutoff date.

Relative to Item (4), plaintiff claims that the December 18, 1970 cutoff date was improperly used to prohibit the reception into evidence of a document wherein Baxter Laboratories allegedly admitted that plaintiff's reaction was due to chymopapain. Actually, two documents are involved. In the first document—some sort of Annual Progress Report on the drug Discase (Baxter's brand name of chymopapain)—plaintiff's injection was categorized as an "Unanticipated Genito-Urinary" adverse reaction. An addendum to the first document purported to list "adverse experiences occurring in the 5,726 patients subsequent to the 2,557 but not related to Chymopapain. . . ." Plaintiff's case was not listed. Plaintiff claims that by not listing her case in the category of adverse reactions unrelated to chymopapain, Baxter admitted that her reaction *was* caused by chymopapain.

■ Even assuming, for the purposes of argument, that the document in question could constitute an admission or an inconsistent statement by Baxter Laboratories, we think it is clear that plaintiff never laid a foundation for the introduction of this document.[6]

Item (5) consists of questions posed to the defendant doctors on cross-examination. Plaintiff asked the defendant Dr. Hunter if he ever reported the plaintiff's case to the Food and Drug Administration. It was objected to as irrelevant and immaterial, and the objection was sustained. Plaintiff also asked the defendant Dr. Johnston whether *Travenol* ever reported the plaintiff's case as an adverse result. There were objections on the grounds that Dr. Johnston's testimony would not be the "best evidence", and

6. The actual document was never offered into evidence. Since the document referred to many cases subsequent to the cutoff date, plaintiff believed she was precluded from offering the actual document. Instead, she attempt-

ed to introduce this matter by offering the deposition of the senior clinical research coordinator of Travenol Laboratories, Dr. Harvey M. Arbit.

that it was irrelevant. The court sustained the latter objection, apparently on the basis that the question involved matters occurring after the injection of the plaintiff. The appellee doctors now argue that Dr. Johnston's answer would have been hearsay.

■ We find no error in the exclusion of this evidence. Plaintiff has not indicated to this Court or to the trial court how the answers would be relevant to her case. For instance, there is hardly any doubt that Mrs. Gaston suffered an adverse experience following her injection with chymopapain. Plaintiff does not suggest what the answers to these questions would be, or how the answers would relate to proof of malpractice or products liability. We are not told whether there was a duty to report the case to the Food and Drug Administration. Nor is there any indication that the answers would have impeached the defendants in any way.

## II. CLAIMED ERRORS RELATING TO THE EXCLUSION OF CERTAIN EXPERT TESTIMONY WHERE THE WITNESS HAD NOT PERSONALLY USED CHYMOPAPAIN ON HUMAN BEINGS

Plaintiff contends that four of her expert witnesses were erroneously prevented from testifying concerning the toxic effect of chymopapain and the causation of her alleged chemical meningitis because the witnesses had not personally injected or observed the injection of chymopapain into human tissue.[7]

Dr. Salem M. Rabson, a pathologist, was prevented from testifying to the destructive effect of chymopapain on tissue. Dr. Rabson had reviewed the records of plaintiff's case, had spent four days reviewing reports on chymopapain at the offices of Travenol Laboratories, and had interviewed several investigators and potential investigators of the drug in Europe. Dr. Bernard Sussman, a professor of neurosurgery, was not allowed to testify that chymopapain, by its injurious effects on tissue, would keep open the pathway made by the needle when the drug was injected into the disk. Dr. Sussman had participated in an experiment in which disk material was exposed to chymopapain, to collagenase (another enzyme), and to normal saline solution. He had examined Exhibits 57 and 58, which were documents of Travenol describing the chemical and pharmacological nature of chymopapain, and he had reviewed the work of other doctors concerning chymopapain. Dr. Peter M. Rocovich, another neurosurgeon, was allowed to testify to the cause of plaintiff's bacterial meningitis, but was prohibited from giving an opinion about the cause of her alleged chemical meningitis or about the toxicity of chymopapain. Dr. Rocovich gained his knowledge of chymopapain from reading medical articles, observing patients who had been previously injected with chymopapain, and reading Exhibit 58. Dr. C. Norman Shealy had observed several patients who had received injections of chymopapain, reviewed the records of another such patient, read at least two medical articles on the drug, and performed an experiment with cats. He was permitted to state that chymopapain was a toxic substance, but was limited to giving those opinions that he could base on the cat experiments alone.

■ Previously in this opinion we have held that the plaintiff could not claim error in the court's ruling that Dr. Shealy could not rely on his observations of patients injected after December 18, 1970. There is another reason why Dr. Shealy was properly prevented from basing his opinion on these patients. During his deposition, Dr. Shealy refused to disclose numerous facts about these patients, contending he was forbidden to do so by the FDA and the physician-patient privilege. The defendant drug companies argue that these omissions were sufficiently important that they were denied the ability to effectively cross-examine Dr. Shealy as to the bases of his opin-

---

7. See also Part VI of this opinion wherein we discuss the exclusion, for similar reasons, of

testimony primarily relevant to the defendant doctors.

ions. We agree. The court was within its discretion in prohibiting Dr. Shealy from relying on these patients in stating his opinions. *See Summit Drilling Corp. v. Commissioner of Internal Revenue,* 160 F.2d 703, 706 (10th Cir. 1947); *see also DuBeau v. Smither & Mayton, Inc.,* 92 U.S.App.D.C. 213, 203 F.2d 395 (1953).

Defendants contend that the balance of the above-described expert testimony was properly excluded for lack of foundation, and because it would have been based partially on hearsay information. Defendants argue that an expert may base his opinion only on facts which are received in evidence or which are observed by him personally. Only Exhibits 57 and 58 and (for Dr. Shealy) the cat experiments, defendants contend, are proper bases for expert opinion, and these sources alone are insufficient foundation for the opinions these experts were asked to give. Such is not the rule in Arizona, however. In *State v. Clark,* 112 Ariz. 493, 543 P.2d 1122 (1975), our Supreme Court set forth the rule governing the permissible bases for expert opinion:

"In the past this court has stated that an expert may not base his opinion on facts not in evidence. *See State v. Gevrez,* 61 Ariz. 296, 148 P.2d 829 (1944). 'The purpose of this rule is to prevent the expert from basing his testimony on assumptions which are unknown to the jury and unsupported by the evidence. * *' State v. Drury,* 110 Ariz. 447, 520 P.2d 495 (1974). This rule, however, ignores custom and practice in the field in which the expert is qualified. We hold that the better approach is the one adopted by Rule 703, Federal Rules of Evidence, which reads as follows:

'The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.'

"This rule provides its own safeguards. The facts or data that may be relied on by the expert are limited by custom and practice in a particular field. Furthermore, the opinion based on these facts, whether or not they are in evidence, is subject to cross-examination. Hence, opposing counsel is given the chance to question their validity. *See* Rule 705, Federal Rules of Evidence." 112 Ariz. at 496, 543 P.2d at 1125.

In *State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061 (1977) the Supreme Court held that:

"[i]t is well-settled in Arizona that a medical doctor may testify as to his expert opinion although this opinion is based in part on what may be characterized as hearsay. *State v. McGill,* 101 Ariz. 320, 419 P.2d 499 (1966)." 116 Ariz. at 168, 568 P.2d at 1066.

█ It appears that the trial court also operated under the assumption that learned medical articles could not form any basis for a witness' expert opinion. This assumption was erroneous.

"If expert witnesses could not rely on information gained through their study of scientific literature because of its hearsay nature, then it would be virtually impossible for any expert to evaluate the facts presented in any lawsuit, because nearly everything a person has learned technically constitutes hearsay." *Reeves v. Markle,* 119 Ariz. 159, 579 P.2d 1382 (*filed* May 10, 1978).

█ Once the defendants' hearsay objection is overcome, the foundational objection has little validity. It is not necessary that an expert witness personally use a drug on human beings before he can testify to the effects of that drug or its lack of effect. For instance, in *Koch v. F.T.C.,* 206 F.2d 311 (6th Cir. 1953), doctors were allowed to testify, based on their general medical and pharmacological knowledge, that certain of Koch's products lacked therapeutic value. *Accord, United States v. Wood,* 226 F.2d 924 (4th Cir. 1955); *John J. Fulton Co. v. F.T.C.,* 130 F.2d 85 (9th Cir. 1942).

■ Thus, it appears the trial court abused its discretion in excluding much of the above-described expert testimony. We find this error harmless to the plaintiff's case against the drug companies, however, because even if all this evidence were admitted, she would have been unable to prevail on any of her claims. The plaintiff asserted claims against the drug companies on theories of strict tort liability and negligence.[8] The excluded testimony would tend to show, as to each of these theories, that plaintiff's injuries were caused in fact by chymopapain, and it would tend to show the toxicity and perhaps the inefficacy of the drug. In another part of this opinion we discuss the plaintiff's strict liability claim, and we hold that chymopapain, under the facts of this case, qualifies for an exemption from the ordinary rules of strict liability in tort. To impose liability for an investigational drug under § 402 A of the Restatement (Second) of Torts (1965), one must show that the drug's preparation, marketing or warnings were improper. This is much like the traditional negligence standard. *See Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1969). Plaintiff failed to show that the drug companies did not exercise reasonable care in manufacturing, testing, and distributing chymopapain, and it appears that none of the erroneously excluded evidence would tend to provide that missing element of breach of the drug companies' duty.[9] Since the plaintiff lacks essential elements of her causes of action even with the admission of the excluded evidence, the trial court's error was not prejudicial as to the drug companies. *See Carver v. Salt River Valley Water Users' Association,* 104 Ariz. 513, 456 P.2d 371 (1969).

**8.** Plaintiff has abandoned her breach of warranty claim by not asserting it on appeal.

**9.** It is also noteworthy that if, as plaintiff contends, the defendant doctors violated the drug companies' protocol in choosing plaintiff as a suitable candidate for injection, or in the performance of the operation, the actions of the defendant drug companies could not be a proximate cause of the plaintiff's injuries. As a general rule, if a physician violates the manufacturer's warnings by using a drug on a type of patient who should not receive that drug, the manufacturer will not be considered the legal or proximate cause of the patient's injuries, and recovery against the manufacturer will be barred both as to negligence and strict tort liability. *Dyer v. Best Pharmacal,* 118 Ariz. 465, 577 P.2d 1084 (Ct.App.1978).

## III. CLAIMED ERRORS RELATING TO THE COURT'S REFUSAL TO GIVE PLAINTIFF'S REQUESTED STRICT LIABILITY INSTRUCTION

■ Plaintiff claims the trial court erred when it refused to give her requested jury instruction no. 43, which concerned strict liability in tort. If a proper request is made, it is reversible error for the court to refuse to instruct the jury on a legal theory which is within the issues of the case and supported by substantial evidence. *Newman v. Piazza,* 6 Ariz.App. 396, 433 P.2d 47 (1967).

The defendant drug companies assert that as to several elements of a strict products liability action, plaintiff presented no substantial evidence.

Arizona has adopted the doctrine of strict products liability as set forth in § 402 A of the Restatement (Second) of Torts (1965). *O. S. Stapley Co. v. Miller,* 103 Ariz. 556, 447 P.2d 248 (1968).

The drug companies first argue that there is no evidence that they sold the drug chymopapain. They reason that because the drug was supplied to the doctors without charge, no sale took place within the meaning of § 402 A. We decline to construe the term "seller" so strictly. In *Delaney v. Towmotor Corp.,* 339 F.2d 4 (2d Cir. 1964), the court construed the Restatement's use of the term "seller" "as a description of the situation that has most commonly arisen rather than as a deliberate limitation of the principle to cases where the product has been sold . . . ." 339 F.2d at 6. For other cases indicating that the application of § 402 A should not be limited to instances of a classic "sale", see *Stang v. Hertz Corp.,* 83 N.M. 730, 497 P.2d 732 (1972); *Berkebile v. Brantly Helicopter*

*Corp.,* 462 Pa. 83, 93, 337 A.2d 893, 898 n. 3 (1975) (dictum); *Lechuga, Inc. v. Montgomery,* 12 Ariz.App. 32, 38, 467 P.2d 256, 262 (1970) (Jacobson, J., concurring).

In the present case, Travenol and Baxter Laboratories were in the business of selling drugs, and their ultimate goal was the commercially profitable sale of chymopapain. Travenol had submitted a New Drug Application to the Food and Drug Administration, but before the FDA would approve the drug for sale, an investigational period was required. In this phase, Travenol distributed the drug to selected physicians for use under carefully controlled conditions, with rigorous reporting of the results. We find that the policies which justify the application of strict products liability principles to those who manufacture and *sell* products also apply to those who manufacture and *supply* products to consumers on an investigational basis, even though the "supplying" does not technically amount to a sale.

The drug companies also contend that plaintiff presented no evidence that chymopapain was defective. They argue that no evidence tended to establish that the drug, if used according to the manufacturer's warnings and directions, would have injured plaintiff. *See* Restatement (Second) of Torts, § 402 A, comment *j* (1965). While plaintiff's evidence that chymopapain was defective if properly used was not overwhelming, we think that enough was presented to allow the issue of strict liability to go to the jury if all other elements could be satisfied.[10]

The drug companies contend that strict liability should not be imposed because chymopapain, a new and experimental drug, was an unavoidably unsafe product. Comment *k* to § 402 A of the Restatement (Second) of Torts (1965) states:

"*k. Unavoidably unsafe products.* There are some products which, in the present state of human knowledge, are quite incapable of being made safe for their intended and ordinary use. These are especially common in the field of drugs. * * * It is also true in particular of many new or experimental drugs as to which, because of lack of time and opportunity for sufficient medical experience, there can be no assurance of safety, or perhaps even of purity of ingredients, but such experience as there is justifies the marketing and use of the drug notwithstanding a medically recognizable risk. The seller of such products, again with the qualification that they are properly prepared and marketed, and proper warning is given, where the situation calls for it, is not to be held to strict liability for unfortunate consequences attending their use, merely because he has undertaken to supply the public with an apparently useful and desirable product, attended with a known but apparently reasonable risk."

This comment expresses a policy judgment that the availability of certain types of products is so important to society that the suppliers of these products should not be subject to strict liability for resulting injuries.

We have found no case specifically holding that experimental or investigational drugs are entitled to the more lenient rules of liability set forth in comment *k*.[11] However, it is apparent from the opinion in *Basko v. Sterling Drug, Inc.,* 416 F.2d 417 (2d Cir. 1969) that the court was applying comment *k* to a drug ("Aralen") that had not been approved by the FDA at the time it was administered to the plaintiff. Several cases have applied comment *k*'s rationale to medical products other than experimental drugs—primarily blood transfusions. *E. g., McMichael v. American Red Cross,* 532 S.W.2d 7 (Ky.Ct.App.1975) (blood); *Brody v. Overlook Hospital,* 127 N.J.Super. 331, 317 A.2d 392 (1974) (blood), *aff'd,* 66 N.J.

---

10. Some evidence of product defect was erroneously excluded by the trial court, *see* Part II, *supra.*

11. One commentator has considered the issue and concluded that comment *k* would apply to investigational drugs. *See* Campbell, *Civil Liability for Investigational Drugs: Part II,* 42 Temple L.Q. 289, 335–36 (1969).

448, 332 A.2d 596 (1975); *Hines v. St. Joseph's Hospital*, 86 N.M. 763, 527 P.2d 1075 (Ct.App.) (blood), *cert. denied*, 87 N.M. 111, 529 P.2d 1232 (1974); *see Heirs of Fruge v. Blood Services*, 506 F.2d 841 (5th Cir. 1975) (blood); *Lewis v. Baker*, 243 Or. 317, 413 P.2d 400 (1966) (MER/29). Other cases have approved the reasoning of comment *k*, but have found that the particular product under consideration failed to meet the requirements for comment *k*'s exemption from strict liability. *E. g., Davis v. Wyeth Laboratories, Inc.*, 399 F.2d 121 (9th Cir. 1968) (inadequate warning of risks of Sabin vaccine); *Toole v. Richardson-Merrell, Inc.*, 251 Cal.App.2d 689, 60 Cal.Rptr. 398 (1967) (MER/29 not "properly prepared and marketed", nor was adequate warning given). *Cf. Basko v. Sterling Drug, Inc., supra*, (timeliness and adequacy of warnings held to be a jury question).

■ Plaintiff claims that chymopapain was defective in two respects: First, that it had no therapeutic value for the treatment of disk disease; and second, that it was a highly toxic substance that would injure human tissue. Even if this were true, however, it does not follow that the manufacturer should be subjected to strict liability. The risks and benefits of new or experimental drugs are often imperfectly known. When a new drug turns out to be less valuable or more dangerous than initially thought, the manufacturer may still be entitled to the exemption from strict liability provided by comment *k*. In the case of experimental drugs, we must ask whether distribution of the drug was justified in light of the facts which were known or which should have been known to a reasonably prudent manufacturer.[12]

The drug chymopapain was designed to provide an alternative to back surgery in cases of disk disease where the patient has failed to respond to conservative, non-surgical treatment. The potential benefits of such a drug are obvious. We have reviewed the evidence, and have found no indication that the risks known to the manufacturer (or which should have been known) were so great as to outweigh the expected benefits from the drug.

■ Once a justifiable decision to distribute the drug has been made, the manufacturer's manner of distribution must also be proper. This requires, among other things, that a proper warning be given. We interpret comment *k* to mean that for experimental drugs, the manufacturer must clearly advise that the drug is experimental, and must warn of known risks and those risks that should be known through the exercise of reasonable care. *Cf. Singer v. Sterling Drug, Inc.*, 461 F.2d 288 (7th Cir.) (where risks are not known, consumer must be warned that the drug is experimental), *cert. denied*, 409 U.S. 878, 93 S.Ct. 131, 34 L.Ed.2d 132 (1972); *Basko v. Sterling Drug, Inc., supra* (duty to warn of known or foreseeable risks); *Davis v. Wyeth Laboratories, Inc., supra* (when danger becomes apparent a duty to warn attaches). In the case of prescription drugs (and especially for investigational drugs, which can be prescribed only by selected physician investigators) the manufacturer's duty to warn is ordinarily satisfied if a proper warning is given to the prescribing physician. *E. g. Dyer v. Best Pharmacal*, 118 Ariz. 465, 577 P.2d 1084 (1978); *Davis v. Wyeth Laboratories, Inc., supra*; *Hines v. St. Joseph's Hospital, supra*. We find no evidence that the drug companies in this case gave inadequate warnings in view of the facts then known about chymopapain. Travenol distributed with the drug a protocol which gave detailed instructions on the use of chymopapain, and Travenol kept in close touch with its investigators to monitor possible adverse reactions of their patients.

---

12. *See* Campbell, *Civil Liability for Investigational Drugs: Part II*, 42 Temple L.Q. 289, 333 (1969):

"No inference should be made that a drug was unreasonably dangerous simply because later information prompts withdrawal of the drug from the market. This applies even more strongly to investigational drugs, so long as preclinical research justified studying the drugs in man. No liability should be imposed for investigational drugs in the absence of fraud, deceit, misrepresentation, or negligence."

Plaintiff has failed to show inadequacy of Travenol's warnings except, possibly, when judged in the wake of subsequent developments.

Finally, the trial court was correct in refusing to give plaintiff's requested jury instruction because it was an erroneous statement of the law. *See, e. g., Valley National Bank v. Witter,* 58 Ariz. 491, 121 P.2d 414 (1942). The requested jury instruction [13] fails to set forth the requirement that the defective product be "unreasonably dangerous to the user or consumer". In *Byrns v. Riddell, Inc.,* 113 Ariz. 264, 550 P.2d 1065 (1976), our Supreme Court expressly held that proof of an "unreasonably dangerous product" is a necessary element in a products liability claim.

## IV. CLAIMED ERRORS RELATING TO THE COURT'S REFUSAL TO GIVE A JURY INSTRUCTION ON ABSOLUTE LIABILITY

Plaintiff contends that the manufacturer of an investigational drug, and the physician who prescribes or administers it, are engaged in an activity which is abnormally dangerous to the public. Therefore, the manufacturer and the physician should be absolutely liable for all bad results of the use of investigational or experimental drugs. Plaintiff argues that all risk cannot be removed from the production of new drugs, and the manufacturer and physician are able to spread this risk among all drug users by increasing the price of drugs and medical services. We find plaintiff's arguments for imposing absolute liability unpersuasive.

Initially, we observe that the liability plaintiff advocates would be far more extensive than the strict products liability of § 402 A of the Restatement (Second) of Torts (1965), since plaintiff would impose liability even in the absence of a defective, unreasonably dangerous product.

To our knowledge, no court has imposed any similar liability on the producers and distributors of drugs. In *Cochran v. Brooke,* 243 Or. 89, 409 P.2d 904 (1966), the only case cited to us in which the application of absolute liability for new drugs was considered, the Oregon Supreme Court declined to impose even the strict products liability of § 402 A.

■ Plaintiff urges that we apply the rule of absolute liability for abnormally dangerous activities stated in § 519 of the Restatement (Second) of Torts (1977). The rules relating to "ultrahazardous" or "abnormally dangerous" activities are inapplicable to the production of new drugs. The law of abnormally dangerous activities traditionally contemplates a hazardous activity occurring in a specific place which causes harm to others in some geographic proximity. *See generally,* Restatement (Second) of Torts §§ 519–524 A (1977). More importantly, one who voluntarily encounters the dangerous activity, or one who is a participant in it, may not recover. *E. g., id.* § 523 (assumption of risk). Normally, the patient voluntarily agrees to be treated with an investigational drug. The general law of medical malpractice requires (*see* Part IX of this opinion), and federal drug law seeks to insure (21 U.S.C. § 355(i) (1970); 21 C.F.R. § 310.102 (1977)), that the physician investigator obtain an informed consent from the patient before administering an investigational drug.

■ Moreover, even if we were inclined to an innovative application of the principles governing abnormally dangerous activities, we do not find that the manufacturing, testing and supplying of new drugs is an abnormally dangerous enterprise. Essentially, there are two risks involved in the development of new drugs: (1) the risk that unforeseen, perhaps catastrophic, injuries will result because a new drug is used in man too soon; and (2) the risk that needless

---

**13.** Plaintiffs' Requested Jury Instruction No. 43:

"The supplier of an article is liable for injuries proximately caused by a defect in the article which existed when the article left possession of the defendants, provided that the injury resulted from a use of the article that was reasonably foreseeable by the defendants."

human suffering and death will occur because a beneficial drug is withheld from mankind too long. Absolute liability for the adverse effects of new drugs would enlarge the latter risk to unacceptable proportions, while giving a remedy only to those injured by the former risk. We do not find the risks involved in the use of investigational drugs to be so great [14] or so unusual that absolute liability should be imposed.

## V. CLAIMED ERRORS RELATING TO THE TRIAL COURT'S REFUSAL TO GIVE PLAINTIFF'S *RES IPSA LOQUITUR* INSTRUCTIONS

At trial, plaintiff submitted two alternative jury instructions on the subject of *res ipsa loquitur*. The judge, however, refused to instruct the jury on the doctrine of *res ipsa loquitur*. Plaintiff now assigns this as error, arguing that her case was an appropriate one for the application of the doctrine. Plaintiff also appeals the giving of what she terms "anti-*res ipsa loquitur*" instructions in which the court instructed that "no presumption of negligence or want of skill arises from the mere fact that the treatment was unsuccessful or failed to bring the best results", and that "an adverse result which is an inherent risk in the procedure does not give rise to a claim of malpractice." [15]

■ In Arizona, the necessary elements of a *res ipsa loquitur* case are these:

"(1) the accident must be of a kind which ordinarily does not occur in the absence of some one's negligence;

"(2) it must be caused by an agency or instrumentality within the exclusive control of defendant;

"(3) it must not have been due to any voluntary action on the part of the plaintiff;

"(4) plaintiff must not be in a position to show the particular circumstances which caused the offending agency or instrumentality to operate to his injury."

*Jackson v. H. H. Robertson Co.,* 118 Ariz. 29, 31–32, 574 P.2d 822, 824–25 (1978), *quoting Capps v. American Airlines,* 81 Ariz. 232, 234, 303 P.2d 717, 718 (1956).

Applying the above analysis to the instant case, we hold that the plaintiff failed to establish the first element, and thus the trial court was correct in not giving a *res ipsa loquitur* instruction.

In the present case it cannot be said to be a matter of common knowledge among laymen that plaintiff's injuries were more probably than not the result of negligence; therefore, we must examine the expert testimony to decide whether it is common knowledge among medical men. *See Riedisser v. Nelson,* 111 Ariz. 542, 534 P.2d 1052 (1975). No witness testified that it was a matter of common medical knowledge that plaintiff's injuries were of a sort that would not ordinarily occur in the absence of negligence. Several of plaintiff's witnesses described specific acts of negligence allegedly committed by the defendant doctors. (For example, piercing the bowel and the dura in the process of injecting the disk). From this testimony, plaintiff would have us infer that the accident which befell her was more probably than not the result of the defendants' negligence. But this is merely the tautology that evidence of negligence implies negligence. If plaintiff's witnesses were believed, the negligence of the doctors would be proven; but there would still be no testimony to establish the existence of the first element of *res ipsa loquitur.*

■ There is a further reason justifying the trial court's rejection of plaintiff's instructions. In the requested instructions,

---

**14.** We note that the development of investigational drugs is extensively regulated by federal law. *See* 21 U.S.C. § 355 (1970).

**15.** The full text of this latter instruction reads:

"Surgical procedures upon the human body involve certain inherent risks. What those risks are in a given operation is, however, the subject of expert testimony and not a matter of lay knowledge.

"If there is no negligence on the part of a surgeon in advising, prescribing or performing an operation, an adverse result which is an inherent risk in the procedure does not give rise to a claim of malpractice."

the applicability of *res ipsa loquitur* was not confined to the defendant doctors. While it is possible to employ the doctrine against multiple defendants in a proper case, *Jackson v. H. H. Robertson Co., supra, res ipsa loquitur* would be inapplicable to the defendant drug companies in the case at bar. There was no showing that the drug companies had control, let alone exclusive control, of the injury-causing instrumentality. Moreover, a *res ipsa* instruction is defective if it lumps all the defendants together without making allowance for the different relationships each defendant has to the instrumentality. *Falcher v. St. Luke's Hospital Medical Center,* 19 Ariz.App. 247, 506 P.2d 287 (1973).

 Nor do we find merit in plaintiff's challenges to the so-called "anti-*res ipsa loquitur*" instructions given by the court. The first, that no presumption of negligence arises from the mere fact of unsuccessful treatment, is a correct statement of the law. The second, that absent negligence by the physician there is no malpractice when the plaintiff suffers an adverse result which is an inherent risk of the procedure performed, is likewise correct in the context it was given. Plaintiff contends, however, that this instruction was error because there was no evidence that the injuries she suffered were inherent risks of the procedure of chemonucleolysis. There is no need to engage in an extended discussion of what are the inherent risks in a new investigational procedure. The jury was clearly instructed that it must refer to expert testimony for the inherent risks in a surgical procedure. Given the issues and evidence presented in this case, the court's instruction was not error.

## VI. CLAIMED ERRORS RELATING TO THE EXCLUSION OF EXPERT TESTIMONY BECAUSE THE WITNESS HAD NEVER PERFORMED CHEMONUCLEOLYSIS

In Part II of this opinion we concluded that the trial court erred in ruling that because certain expert witnesses had never personally used chymopapain, they were not qualified to give opinions on the effects of that drug. The trial court followed a similar reasoning in ruling that doctors who had never performed lateral lumbar diskography and chemonucleolysis were not qualified to give expert opinions relating to those techniques. Plaintiff contends the court also erred in excluding this latter testimony. We agree, but testimony concerning the defendant doctors' performance of the technique of chemonucleolysis presents a slightly different legal issue, and it deserves separate analysis.

Doctor Sussman was not allowed to say whether the needles shown on plaintiff's X-ray films were "properly" placed, the trial court having sustained an objection by the defendant doctors that the witness had not performed a diskogram and had observed only diskograms which had been performed using the posterior approach.[16] Later, Dr. Sussman was precluded from testifying that the X-ray equipment used in plaintiff's injection was placed so close to the operating field that sterility would be compromised. Dr. Sussman *was* allowed to tell whether the X-rays showed that the needles were placed in the nucleus pulposus, as required by the Travenol protocol, but he was not allowed to say whether the needles were "correctly" placed, or whether the placement complied with that specified in the protocol.

Doctor Peter M. Rocovich was allowed to give his opinion as to whether the tips of the needles appeared to be in a position to inject dye into the nucleus pulposus, but he was not permitted to say whether they were in a position to inject any material intrathecally (that is, through the covering of the spinal canal).

Doctor Shealy was not allowed to give his opinion whether the lateral approach for injecting a disk in the lumbar area presents more problems than the posterior or poster-

16. At one point, Dr. Sussman stated he had observed both lateral and posterior diskograms.

Travenol Laboratories specified that the lateral approach was to be used for chymopapain injection.

olateral approaches, because he did not personally use the lateral approach. At other times, however, Dr. Shealy was allowed to testify that the posterior approach is chosen to avoid potential injury to nerve roots by the lateral or posterolateral approaches. On objection that Dr. Shealy had never performed the procedure of chemonucleolysis, he was prevented from giving an opinion whether Travenol's protocol had been complied with in plaintiff's case. However, Dr. Shealy *was* allowed to compare the protocol and the X-ray films of plaintiff's injection and testify that the needles did not appear to be properly placed. He was also permitted to state that, according to the protocol, plaintiff was not a proper candidate for injection.[17]

The troublesome issue presented by the above testimony is whether a medical expert must have personal experience with a particular medical procedure before he can express an opinion which relates in any way to the defendant doctors' performance of that procedure on the plaintiff.

Plaintiff cites *Chalupa v. Industrial Commission,* 109 Ariz. 340, 509 P.2d 610 (1973) for the proposition that a licensed medical doctor is automatically qualified to answer any question relating to medicine. In that portion of the opinion to which appellant refers, the court states:

"While doctors with unlimited licenses are competent to give expert testimony in the entire medical field, a chiropractor or naturopath is a competent expert witness only in the limited field in which he is licensed by the State." 109 Ariz. at 341, 509 P.2d at 611.

In *Chalupa,* the issue was whether a chiropractor could testify that the plaintiff's symptoms were caused by a prior injury to the spine. The court concluded that the chiropractor was competent to testify on this issue, but the court was careful to distinguish the chiropractor's limited field of expertise from the much broader scope of a medical doctor's knowledge. We do not construe *Chalupa* to mean that any licensed doctor of medicine is a qualified expert witness on every conceivable medical issue.

The defendant doctors take the converse position that personal experience is absolutely required before a medical expert can express an opinion which relates to a particular medical procedure.

The correct rule governing the experiential qualifications of an expert witness lies between the two extremes urged on us by plaintiff and defendants. The party offering expert testimony must show that the witness is competent to give an expert opinion on the precise issue about which he is asked to testify. *Myers v. Cessna Aircraft Corp.,* 275 Or. 501, 553 P.2d 355 (1976). However, in Arizona, an expert witness may be qualified to give an opinion by reason of actual experience or careful study. *Board of Regents v. Cannon,* 86 Ariz. 176, 342 P.2d 207 (1959). The standard for medical experts is no different.

> " 'The rule is very well settled that, to give an opinion on medical questions, one may be qualified by study without practice, or by practice without study.' "
>
> *Hawkins v. Schofman,* 204 So.2d 336, 339 (Fla.Ct.App.1967), *cert. denied,* 211 So.2d 215 (Fla.1968), *quoting with emphasis Copeland v. State,* 58 Fla. 26, 32, 50 So. 621, 624 (1909).

The better reasoned cases from other jurisdictions are those which recognize that on a given medical topic, a physician may become a competent expert through study and consultation. *E. g., Hawkins v. Schofman, supra; Ragan v. Steen,* 229 Pa.Super. 515, 331 A.2d 724 (1974); *Quinley v. Cocke,* 183 Tenn. 428, 192 S.W.2d 992 (1946). *See also, Brown v. Colm,* 11 Cal.3d 639, 114 Cal.Rptr. 128, 522 P.2d 688 (1974). The test in every case is whether the witness possesses special knowledge about the subject at issue which will assist the jury in making its decisions. *See Board of Regents v. Cannon, supra.*

---

**17.** A motion was made to strike this testimony. The court reserved its ruling. We have found no indication of the court's ultimate decision.

■ Applying the above test, we conclude that it was error to reject the testimony of these witnesses for lack of personal experience with chemonucleolysis. For instance, Dr. Rocovich was asked whether the needles were in such a position that they would inject dye intrathecally. This testimony would require a knowledge of anatomy and the ability to read X-rays. Dr. Sussman was not allowed to say whether the needles were positioned according to the protocol issued by Travenol Laboratories. The only additional knowledge required here was the ability to read and understand the instructions contained in the protocol relating to how the injection should be performed.[18]

It is also worthy of remark that plaintiff's experts in the instant case were not without some practical experience. They were familiar with the anatomy of the spine and surrounding tissues, with the injection of intervertebral disks, and with the reading of X-ray films. *Cf. Brown v. Colm, supra* (the witness had engaged in the active practice of medicine, but not at the precise time when the alleged malpractice occurred). There may be instances where a physician will not be qualified to answer a particular medical question unless he has performed a certain medical procedure. But the questions we are here concerned with were not of that type. The witnesses could have answered them based upon their general medical knowledge and experience and their study of the relevant medical data and materials.[19]

■ Where, as here, a rare or unusual medical technique is involved, we feel it is especially important that the trial court keep open the possibility that plaintiff's expert witnesses may be competent to testify without having actually performed the procedure.[20] If we were to follow defendants' view of the law, the plaintiff would have been placed in an untenable situation: she would have been contending that the technique of chemonucleolysis was dangerous and of no therapeutic value, but the only expert witnesses available to her would have been those who actually performed the technique.

The defendant doctors again raise the argument that plaintiff's experts, having no personal experience with chemonucleolysis, were relying in part on hearsay information to formulate their opinions. In Part II of this opinion we rejected this argument. Our reasoning applies equally to the expert testimony being presently discussed.

■ Finally, the defendant doctors contend that plaintiff failed to make offers of proof as to much of this testimony, and, consequently, cannot urge its rejection as error. However, where the purpose and purport of the expected testimony is obvious, as it is here, an appellate court will review the exclusion of that testimony even without an offer of proof. *E. g., State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061 (1977).

We conclude the trial court abused its discretion in rejecting the above-described expert testimony. The court's erroneous

---

18. This testimony was not offered to prove the applicable standard of care, an issue on which courts may require more stringent qualifications on the part of the expert witness. *See Seneris v. Haas,* 45 Cal.2d 811, 832, 291 P.2d 915, 927 (1955).

Most cases hold that the manufacturer's instructions are at least some evidence of the appropriate standard of care in the administration of a drug. *See, e. g., Julien v. Barker,* 75 Idaho 413, 272 P.2d 718 (1954). Thus, a witness who testified that the instructions were violated would not be giving an opinion on what standard of care should apply—he would only be saying that an independently-established standard of care had been breached.

19. Where a medical witness has been prevented from testifying, it is usually the case that the witness lacked both practical experience and the vicarious experience of study. *E. g., Swanson v. Chatterton,* 281 Minn. 129, 160 N.W.2d 662 (1968); *Peters v. Gelb,* 314 A.2d 901 (Del. 1973); *see also, Hunt v. Bradshaw,* 251 F.2d 103 (4th Cir. 1958) (the court does not state whether the witness had made any special study of the subject).

20. *But see Dow v. Kaiser Foundation,* 12 Cal. App.3d 488, 90 Cal.Rptr. 747 (1970), where the court suggested that a physician be allowed to testify without practical experience only where the procedure involved was truly unique, not just unusual.

rulings excluding certain of Dr. Shealy's opinions were harmless errors, since the plaintiff was allowed to elicit the substance of these opinions from Dr. Shealy at other times in the trial. However, we are unable to say that errors in excluding the opinions of Drs. Sussman and Rocovich were similarly harmless, and, in view of other evidentiary and instructional errors discussed elsewhere in this opinion we find it necessary to reverse as to those defendants to whom this testimony was primarily relevant—Drs. Hunter and Johnston, and Arizona Orthopedists.

## VII. CLAIMED ERRORS RELATING TO THE REJECTION OF THE TESTIMONY OF NEUROSURGEONS THAT THE DEFENDANT ORTHOPEDIC SURGEONS DEVIATED FROM THE APPLICABLE STANDARD OF CARE

 Three of plaintiff's witnesses who specialized in neurosurgery, Drs. Sussman, Rocovich and Dodge, were precluded from answering certain questions relating to whether the defendant orthopedic surgeons had breached the applicable standards of medical care in their treatment of plaintiff. Plaintiff asserts that it was error to prevent these neurosurgeons from testifying to the standard of care applicable to the defendant orthopedic surgeons. Although we hold that the trial court did not err under the evidence developed in the trial court, the following discussion is intended as guidance should this issue arise again when this case is remanded.

 The leading Arizona case on the standard of care that must be met by a defendant in a medical malpractice action is *Kronke v. Danielson,* 108 Ariz. 400, 499 P.2d 156 (1972). In *Kronke,* it was held that general practitioners must exercise the skill and knowledge normally possessed by physicians in the "same or similar community", but that specialists will be held to a national standard.[21] The court stated the rule for specialists in this way:

"We hold that, for a plaintiff to recover in a medical malpractice case involving a specialist, he must prove that the defendant specialist in his acts failed to meet the standard of care required of physicians in the same specialty practiced by the defendant. To qualify an expert to express an opinion on what that standard of care is for the speciality of the defendant, the party offering the witness must establish the witness' knowledge and familiarity with the standard of care and treatment commonly practiced by physicians engaged in the same type of specialty as the defendant." 108 Ariz. at 403, 499 P.2d at 159.

It is not strictly necessary that the witness be of the same specialty as the defendant. "It is the scope of the witness' knowledge and not the artificial classification by title that should govern the threshold question of admissibility." *Fitzmaurice v. Flynn,* 167 Conn. 609, 618, 356 A.2d 887, 892 (1975). *Accord Cline v. Lund,* 31 Cal.App.3d 755, 107 Cal.Rptr. 629 (1973); *Radman v. Harold,* 279 Md. 167, 367 A.2d 472 (1977). *See Harris v. Campbell,* 2 Ariz.App. 351, 409 P.2d 67 (1965); *Steinberg v. Indemnity Insurance Co. of North America,* 364 F.2d 266 (5th Cir. 1966); *Frazier v. Hurd,* 380 Mich. 291, 157 N.W.2d 249 (1968). The witness may acquire his knowledge of the applicable standard of care through education, experience, observation or association with that specialty. *Cline v. Lund, supra; Evans v. Ohanesian,* 39 Cal.App.3d 121, 112 Cal.Rptr. 236 (1974).

However, "more than a casual familiarity with the specialty of the defendant physician is required." *Fitzmaurice v. Flynn,* 167 Conn. at 618, 356 A.2d at 892; *see also Frazier v. Hurd, supra.* In the present case, none of the plaintiff's witnesses demonstrated any significant familiarity with the medical standards to which an orthopedic surgeon must adhere. The witness who had perhaps the greatest opportunity to acquire

---

21. Arizona's new medical malpractice legislation would hold the specialist to a statewide standard of care. A.R.S. § 12–563. The new law, however, would not apply to pending actions. *See* note 25 *infra.*

knowledge of orthopedic procedures was Dr. Rocovich. Although a neurosurgeon, he had served on the staff of an orthopedic hospital, had discussed lumbar diskograms with orthopedic surgeons, and had sometimes worked with orthopedic surgeons on the same patient. We do not believe that these facts alone showed such a familiarity with the orthopedic standards of care as to require a finding that the trial judge abused his discretion in refusing to admit Dr. Rocovich's testimony.

■■■■ Plaintiff urges that a recognized variation of the rule that a witness must be familiar with the standard of care practiced by the defendant physician is applicable here. If the witness is familiar with the standard of care applicable to one specialty and if it can be established that the standards or procedures adhered to in the defendant's different specialty are the same as that of the witness, then the witness' testimony is competent to establish the standard of care by which the defendant must be judged. *See, e. g., Caro v. Bumpus,* 30 Colo.App. 144, 491 P.2d 606 (1971); *Ashburn v. Fox,* 233 So.2d 840 (Fla. Ct.App.1970), *cert. dismissed,* 242 So.2d 873 (Fla.1971); *Sutton v. Cook,* 254 Or. 116, 458 P.2d 402 (1969). If the defendant's and the witness' schools of practice do not totally agree in their standards of medical care, the witness may nevertheless testify on those points as to which the principles of the schools do or should concur. *Ashburn v. Fox,* 233 So.2d at 841. This principle of the coincidence of standards of care is often applied to allow a witness of a different locality, specialty or school to testify to the defendant's breach of certain minimum standards common to all medical practitioners. *See Pollard v. Goldsmith,* 117 Ariz. 363, 572 P.2d 1201 (Ct.App.1977) (different locality); *Mirich v. Balsinger,* 53 Cal.App.2d 103, 127 P.2d 639 (1942) (different specialty); *Hutter v. Hommel,* 213 Cal. 677, 3 P.2d 554 (1931) (different school); *Harris v. Bales,* 459 S.W.2d 742 (Mo.Ct.App.1970) (different school); *Faulkner v. Pezeshki,* 44 Ohio App.2d 186, 73 Ohio Ops.2d 201, 337 N.E.2d 158 (1975) (different locality); *Christian v. Jeter,* 445 S.W.2d 51 (Tex.Civ.

App.1969) (different specialty); *see also Hill v. Gonzalez,* 454 F.2d 1201 (8th Cir. 1972) (different specialty).

■■■ However, before a witness may be allowed to testify on the basis of the similarity of standard between two fields of the healing arts, competent evidence must be presented to establish that the standards of care in the two fields are in fact similar. In the present case, plaintiff relies upon the testimony of Dr. Thomas Taber, an orthopedic surgeon, to establish that the standards of care for neurosurgery and orthopedic surgery are the same. Doctor Taber testified that when dealing with disk disease, the criteria for intervention are substantially the same for both specialties. Clearly, Dr. Taber was qualified to testify on the orthopedic standard of care, but his testimony did not reveal that he would be competent to compare that standard to the standards prevalent in neurosurgery.

Plaintiff also attempts to link the standards of care in orthopedic surgery and neurosurgery by certain testimony elicited from the defendant Dr. Johnston. Doctor Johnston testified that plaintiff was suffering from a disk problem which impinged to some degree on the nerve. He also testified that surgery for this kind of nerve problem could fall into the field of neurosurgery. In our opinion, Dr. Johnston's testimony did not establish that the standards of care in the two specialties are the same or similar.

■■■■ Plaintiff further argues, based upon the testimony of Dr. Johnston, that the defendants actually invaded the field of neurosurgery, and should be held to the standards of medical care applicable in that field. Concededly, when the defendant undertakes to perform the work of a specialist, he will be held to the standard of care applicable to that specialty. *See Simpson v. Davis,* 219 Kan. 584, 549 P.2d 950 (1976). However, the evidence does not show that in performing the technique of chemonucleolysis the defendants had abandoned the field of orthopedic surgery. The mere fact that two specialties may treat the same symptoms or perform the same operations

does not imply that a physician's conduct will no longer be tested by the standards of his own school or his own specialty. *See Rickett v. Hayes*, 256 Ark. 893, 511 S.W.2d 187 (1974). *See also, Sutton v. Cook, supra.*

VIII. CLAIMED ERROR RELATING TO AN INSTRUCTION TO THE JURY THAT THE DEFENDANT PHYSICIANS WERE PRESUMED TO POSSESS AND APPLY THE REQUISITE DEGREE OF SKILL AND LEARNING

Plaintiff claims that the trial court erred in giving to the jury the following instruction:

"You are instructed that Willard S. Hunter and Howard Johnston are presumed to possess the degree of skill and learning which is possessed by the average member of the medical profession in good standing, practicing in the specialty of orthopedics and they are presumed to apply that skill and learning with ordinary and reasonable care in the treatment of the plaintiff, Katherine Gaston.

"If Dr. Hunter and/or Johnston did not possess the requisite skill and learning or if he or they did not apply it, he or they would be guilty of malpractice."

We agree that the quoted instruction was, in the context given, erroneous.

This instruction that a physician is presumed to have exercised due care has its roots in the case of *Boyce v. Brown*, 51 Ariz. 416, 77 P.2d 455 (1938). In *Boyce*, the court listed several rules applicable to malpractice actions, one of which being that:

"(1) One licensed to practice medicine is presumed to possess the degree of skill and learning which is possessed by the average member of the medical profession in good standing in the community in which he practices, and to apply that skill and learning, with ordinary and reasonable care, to cases which come to him for treatment. If he does not possess the requisite skill and learning, or if he does

not apply it, he is guilty of malpractice." 51 Ariz. at 420, 77 P.2d at 457.

The authority given for this proposition was *Butler v. Rule*, 29 Ariz. 405, 242 P. 436 (1926). *Butler*, however, said nothing about presumptions. The issue in *Butler* was the proper standard of care, and the court concluded that a physician is bound to possess and exercise that degree of care and skill normally exercised by the average member of the medical profession, and would not be held to a standard of the "highest" care. Reading the passage in *Boyce* in light of *Butler*, we are convinced that the *Boyce* court was emphasizing a standard of care to be applied in medical malpractice actions, and did not intend to formulate an evidentiary presumption of due care on the part of physicians.[22]

If the quoted language is intended to create a presumption in favor of a defendant physician, it is a strange species of presumption indeed. It does not fit the typical description of a presumption in a civil case—that is, a rule that shifts the burden of producing evidence to the party against whom the presumption operates. *See* McCormick's Handbook of the Law of Evidence § 342 at 803 (2d ed., 1972). Rather, this "presumption" appears to do no more than merely restate the familiar rule that the plaintiff has the burden of proving the defendant negligent. *See Britton v. Hartshorn*, 113 Conn. 484, 156 A. 48 (1931). *But see, Richmond v. A. F. of L. Medical Service Plan of Philadelphia*, 421 Pa. 269, 218 A.2d 303 (1966) (presumption of physician's non-negligence is distinct from plaintiff's burden of proof). In our opinion the case of *Board of Water Commissioners v. Robbins & Potter*, 82 Conn. 623, 74 A. 938 (1910) correctly analyzes the effect of a presumption in a situation similar to that here involved:

"Presumptions like that appealed to [that officials act honestly] have no probative force. They perform an office in the absence of evidence, so that one who

---

22. We are aware that the passage in *Boyce* has been cited by more recent Arizona decisions. None of these cases, however, formulate a presumption such as the defendants would have us apply.

has cast upon him the burden of proof as to a given proposition may be enabled to sustain that burden upon the strength of a presumption without the presentation of proof. *When such a presumption is advanced in favor of one upon whom the burden of proof does not rest, it really adds nothing to the duty or burden of the other party, since the latter is already under the obligation to present proof in support of his contention, and the presumption only reiterates that obligation.*" (Emphasis added). 82 Conn. at 640, 74 A. at 945.

Since we find the presumption of a physician's due care to be merely the other side of the coin of the plaintiff's burden of proving negligence, it would have been preferable for the court to instruct the jury only on the burden of proof. *See Britton v. Hartshorn, supra; see also* McCormick, *supra,* § 345, at 829.

At least two cases from other jurisdictions appear to take the position that it is reversible error to instruct the jury on both the presumption of due care and the plaintiff's burden of proof where evidence has been introduced tending to show negligence of the defendant physician. In *Peacock v. Piper,* 81 Wash.2d 731, 504 P.2d 1124 (1973) and in *Richmond v. A. F. of L. Medical Service Plan of Philadelphia, supra,* it was held that instructing on the presumption could erroneously give the jury the impression that the plaintiff had to overcome a double burden to prove his case.[23]

The defendant doctors cite to us the case of *Hill v. Hospital Authority of Clarke County,* 137 Ga.App. 633, 224 S.E.2d 739 (1976) for the proposition that it is not reversible error to charge the jury that medical or surgical services are presumed to be performed in an ordinarily skillful man-

ner. We find *Hill* to be unpersuasive. We cannot compare the instruction given in *Hill* to that given in the instant case, because nowhere in the *Hill* opinion was the instruction set forth. When the *Hill* court approved the presumption of the physician's due care, it made clear the fact that the presumption was the plaintiff's burden of proof in different dress. 137 Ga.App. at 638, 224 S.E.2d at 743. In the present case, the jury was instructed not only that the physicians were presumed to have exercised the requisite degree of care, but that negligence on the part of the defendant doctors is never presumed, that the mere fact of unsuccessful treatment does not give rise to a presumption of negligence, and (twice) that the plaintiffs must affirmatively prove negligence. Unlike the instructions in *Britton v. Hartshorn, supra,* the jury instructions here in question failed to establish the connection between a presumption of due care and the plaintiff's burden of proving negligence.

▪ In summary, we find that the challenged instruction was an unnecessary and prejudicial reiteration of the plaintiff's burden of proving the defendant doctors to be negligent. When read in context with the other instructions, *see, e. g., Kauffman v. Schroeder,* 116 Ariz. 104, 568 P.2d 411 (1977), we find the "presumption" instruction confusing and likely to mislead the jury into believing that a malpractice plaintiff bears a double burden in proving her case.

## IX. CLAIMED ERROR RELATING TO THE COURT'S INSTRUCTIONS ON INFORMED CONSENT

▪ Plaintiff contends the court's instructions [24] emasculated the doctrine that a

---

**23.** One of plaintiff's objections to this instruction was that the jury was not told how the presumption could be overcome. Moreover, in closing argument counsel for the defendant doctors capitalized on this instruction by telling the jury that the presumption of the defendants' due care "never never disappears".

**24.** The pertinent parts of the instructions given by the court were:

"It is the duty of a physician to not misrepresent the risks of surgery or to minimize the probable consequences of an operation so as to obtain the consent of the patient and to not misrepresent or minimize the probable effectiveness of any alternative to surgery which may have been recognized and customarily accepted by the medical profession as a treatment for the patient's alleged condition.

physician, absent exceptional circumstances, must obtain an informed consent from his patient before operating. We disagree, and we hold that the jury was adequately instructed as to the information that a doctor must disclose.

In Arizona, the physician's duty to disclose information about a surgical operation is measured by two different legal yardsticks: battery[25] and professional negligence (malpractice).

> "[A] consent to a surgical procedure is effectual if the consentor understands substantially the nature of the surgical procedure attempted and the probable results of the operation. This, as a matter of law, constitutes an informed consent. Lacking this, the operation is a battery unless some special exception pertains. Given an informed consent, liability, if any, must be predicated in malpractice. In malpractice, the duty of the physician to disclose is determined by the normal practices of his profession in the particular community. We do not attempt to determine the law in the case of particularly dangerous operations, when some courts have ruled as a matter of law that disclosure must be made."

*Shetter v. Rochelle*, 2 Ariz.App. 358, 370, 409 P.2d 74, 86 (1965) (footnote omitted) (citations omitted), *modified on other grounds*, 2 Ariz.App. 607, 411 P.2d 45 (1966). *Accord, Hales v. Pittman*, 118 Ariz. 305, 576 P.2d 493 (1978).

Plaintiff argues, however, that the law should be different for novel procedures like chemonucleolysis. First, she challenges the rule concerning the negligence aspects of this issue, that a physician's disclosures will be judged by the normal practices within the defendant's specialty. Plaintiff points out that only one doctor (Dr. Johnston) was an authorized investigator for chymopapain in Arizona at the time plaintiff's injection was given. When Dr. Hunter obtained the plaintiff's "consent" to the procedure, he had not performed any such operations himself. Thus, plaintiff argues, the defendants were able to set their own standards of disclosure because no one else was performing this new technique. This, she argues, is really no standard at all. Plaintiff views the rule too narrowly. Properly interpreted, it would allow other orthopedic surgeons (or physicians knowledgeable about orthopedic surgery) to testify to what is the accepted practice of disclosure when a new or unusual surgical technique is being contemplated. There is no requirement that expert testimony on this topic be limited to those who have actually performed the new procedure. *See* Part VI, *supra*. Moreover, the malpractice theory is only one way in which the law seeks to insure that the patient is adequately informed. *See Hales v. Pittman, supra.* The other theory of recovery is battery.

As stated in *Shetter v. Rochelle, supra*, if a patient consents to an operation while understanding "substantially the nature of the surgical procedure attempted and the probable results" then no battery occurs when such an operation is performed. Plaintiff argues, first, that one cannot know the "probable results" of a procedure which, like chemonucleolysis, has been incompletely investigated; thus, the rule has no meaning when applied to this case. Elsewhere in this opinion we have held that absent unusual facts it would be improvident to impose strict liability on the manufacturer of an investigational drug or

* * * * * *

"You are instructed that a consent to a discogram and chemonucleolysis is valid and effectual if plaintiff, Katherine Gaston, understood substantially the nature of the procedure attempted and the probable results of such procedure.

"The duty of the physician in this case to disclose certain information with respect to the discogram and chemonucleolysis is judged and determined by the normal practices of the specialty practiced by Dr. Willard S. Hunter."

25. A.R.S. § 12–562 B purports to eliminate battery as a cause of action against a "licensed health care provider". This provision, which is a part of recent, comprehensive legislation on medical malpractice (1976 Ariz.Sess.Laws, 1st Spec.Sess., ch. 1 at 989), would not affect actions initiated before the statute's effective date, *Allen v. Fisher*, 118 Ariz. 95, 574 P.2d 1314 (Ct.App.1977).

the doctor who prescribes it. Essential to that holding is the premise that the patient must be given an informed choice whether to submit to a proposed treatment. *See Hales v. Pittman, supra.* Thus, we also hold that when a physician contemplates a novel or investigational procedure he must inform his patient of the novel or investigational nature of the procedure. Absent this, he has committed a battery. Of course, there are other types of information important to the patient's ability to give an informed consent. *Hales v. Pittman, supra,* discusses some of these, including the statistical probability of the risks associated with a proposed procedure, the treating physician's experience (or lack of experience) in performing that procedure, his prior results (if significantly different from the norm), and the risks and benefits of alternative treatments. In the present case, for instance, the fact that Dr. Hunter had limited experience with the procedure and was not an authorized investigator of chymopapain would be relevant to plaintiff's informed consent to the operation.[26]

Nevertheless, we find no reversible error in the court's instructions. In *Hales v. Pittman, supra,* the Supreme Court approved the following instruction on battery:

"A surgeon may perform a surgical procedure only with the patient's consent. If the surgical procedure is performed without the patient's consent, the surgeon commits a battery on the patient. For the patient's consent to be valid it is necessary that he be made aware substantially of the nature of the surgical procedure proposed and the probable results of the operation."

Observing that "[t]he court is not required to instruct on every suggested refinement", 576 P.2d at 498, the Supreme Court found that the quoted instruction adequately stated the law.

Plaintiff next argues that the procedure of chemonucleolysis was a "particularly dangerous operation", and that Arizona courts have not decided the degree of disclosure required in such cases. *Shetter v. Rochelle,* quoted *supra.* The record in this case does not appear to indicate that chemonucleolysis, properly performed, is a particularly dangerous operation. However, we need not decide that question. *Hales v. Pittman* indicates that the rule on informed consent is flexible enough to encompass dangerous or novel procedures.

Finally, plaintiff claims that the jury was not adequately instructed that a physician is liable for damages if he obtains a "consent" to an operation by misrepresentation or fraud. We disagree. The misrepresentation theory was adequately presented to the jury. *See* note 24, *supra.*

## X. CLAIMED ERRORS RELATING TO ALLEGED JUDICIAL MISCONDUCT

Plaintiff contends the trial judge was guilty of at least 32 separate instances of misconduct, which combined to deny plaintiff a fair trial. The alleged misconduct falls into these categories: Commenting adversely upon certain of plaintiff's witnesses; seeking the advice of other judges and lawyers on questions of law; rebuking plaintiff's counsel (usually outside the presence of the jury); restricting the terminology and information that plaintiff's counsel could use in argument; ruling incorrectly regarding the examination of witnesses (many of these rulings are discussed in other parts of this opinion); and presiding at trial while taking medication for hypertension. We have examined each of plaintiff's grievances and we find very little merit in them. We will discuss only the least trivial.

One of plaintiff's expert witnesses, Dr. Bernard Sussman, was repeatedly admonished by the trial court during cross-examination to answer only the question asked, and not volunteer additional information. In later cross-examination, this same witness was asked whether he had testified that the presence of E-coli bacteria in the spinal fluid was one of the factors he con-

---

**26.** In the case of a new or unusual procedure, the individual physician's experience and "track record" would seem even more impor-tant than when an established, common proce-dure is contemplated.

sidered in making his diagnosis of plaintiff's alleged chemical meningitis. The witness claimed he could not answer that question flatly yes or no. The court then stated "it will be presumed the answer to the question is, 'I do not remember.' I am tired of this." When plaintiff's counsel took exception to this statement, the court responded "If I want to hear from you I will ask for it".

▇▇▇▇ The trial judge has a duty to see that the trial is conducted in an orderly manner, *City Transfer Co. v. Johnson*, 72 Ariz. 293, 233 P.2d 1078 (1951), and the exercise of this duty will include an occasional admonishment to a reluctant witness. A claim of improper judicial remarks must be evaluated according to the particular circumstances of each case. *Id.* In this case, the claimed judicial misconduct does not justify a reversal. The admonishments to Dr. Sussman to simply answer the question were justified. While we do not approve the trial judge's presuming to answer for the witness, or his rebuking of counsel for an objection to such a practice, we cannot say that this conduct denied plaintiff a fair trial. The trial of this matter took over three months (not counting the time lost when a mistrial was declared). Counsel for all parties engaged in vigorous advocacy, which at times was less than courteous to court and opposing counsel. In such a long and difficult trial, we think it unrealistic to expect that a trial judge will never make an unwise or intemperate remark.

▇▇▇▇ Plaintiff also contends that the judge acted improperly in consulting disinterested judges and attorneys on certain questions of law. We do not find error in this. Canon 3(A)(4) of the Code of Judicial Conduct appears to sanction the propriety of consulting a disinterested expert on a difficult question of law.[27] Moreover, the judge clearly informed the parties that he was utilizing other judges and attorneys as "sounding boards", and plaintiff voiced no immediate objection. Ordinarily, a party waives his right to appeal an instance of judicial misconduct if he fails to object at a time when the alleged misconduct could be cured. *See Allied Van Lines v. Parsons*, 80 Ariz. 88, 293 P.2d 430 (1956).

The remaining instances of alleged judicial misconduct border on frivolity. Viewing the trial in its entirety, we are convinced that plaintiff suffered no prejudice from the court's remarks or conduct.

## XI. CONCLUSION

In Parts I through V and in Part X of this opinion we have discussed alleged errors relating to the liability of the defendant drug companies,[28] and we have concluded that no errors were committed which would justify reversing the judgment on the jury's verdict for the defendant drug companies. That judgment must therefore be affirmed.

While several allegations of error pertinent to the liability of the defendant doctors have likewise been rejected (see Parts I, IV, V, VII, IX and X of this opinion), in Parts VI and VIII we found that errors were committed which necessitate granting plaintiff a new trial against the defendant doctors. Since these errors do not affect plaintiff's claims against the doctors based on lack of informed consent, and since we have concluded in Part IX that the jury was adequately instructed on both the negligence and the battery theories of informed consent, no new trial is required on that issue.

Accordingly, the judgment entered by the trial court is reversed insofar as concerns the negligence claim (excluding any issue relating to informed consent) against the

27. "A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* applications concerning a pending or impending proceeding. *A judge, however, may obtain the advice of a disinterested expert on the law applicable to a proceeding.*" (Emphasis added). Ariz.Sup.Ct.Rule 45, Canon 3(A)(4), 17A A.R.S.

28. With the exception of Part III, the discussions in Parts I through V and in Part X are also relevant to alleged errors relating to the defendant doctors.

defendant doctors, and the matter is remanded for further proceedings in the trial court consistent with this opinion. As to all other claims asserted against the defendant doctors, and as to all claims asserted against the defendant drug companies, the judgment is affirmed.

NELSON and DONOFRIO, JJ., concur.